549 P.2d 235

**The STATE of Arizona, Appellant,**

v.

**John N. NICHOLS, Appellee.**

**No. 2 CA–CR 755.**

Court of Appeals of Arizona,
Division 2.

May 10, 1976.

Rehearing Denied June 15, 1976.

Review Denied July 20, 1976.

**456**

———◆———

Bruce E. Babbitt, Atty. Gen., Dennis DeConcini, Pima County Atty. by Frank W. Frey, Deputy County Atty., Tucson, for appellant.

Hirsh, Shiner & Polis, P. C. by Jeffrey W. Hanes, Tucson, for appellee.

## OPINION

HOWARD, Chief Judge.

Appellee was indicted for unlawful possession of cocaine. This is an appeal by the State from the granting of appellee's motion to suppress.

The cocaine was found upon appellee's person, after a stop and frisk revealed that appellee was carrying a concealed weapon. It is clear from the suppression order that the trial court was of the opinion that the police had no reasonable grounds to believe that appellee was armed and, therefore, that the frisk was unlawful. We disagree with this conclusion and vacate the trial court's order.

The events which led to appellee's arrest began about noon on April 4, 1975, in one of Tucson's better residential areas which lies just east of the El Con Shopping Cen-

ter. This area had a high burglary rate. Mrs. Marilyn Hodges, who resided in the area, was backing her car out of her driveway when she saw appellee pull up and park in front of a vacant house across the street. Appellee was driving a yellow-green pickup truck. Mrs. Hodges had in the past prevented three burglaries and even surprised a burglar inside her home. Because of the problems with burglaries, she had that very same morning spoken with an officer from the Tucson Crime Prevention Unit about a neighborhood watch program. Because of the many burglaries that had occurred, Mrs. Hodges was curious as to why the truck had parked in front of a vacant house. To satisfy her curiosity, Mrs. Hodges pulled her car across the street directly behind the truck.

Appellee Nichols got out of the truck and Mrs. Hodges observed that she had never seen him before in the neighborhood, that he was dressed like a "hippie" and that he seemed out of place for the area. She saw Nichols walk back towards her and observed that when he saw her watching him, he turned around and walked back to the cab of his truck and was "pretending to be busy" or "doing something". Nichols then slammed the truck door shut, walked by Mrs. Hodges, walked down the street past several houses and then "ducked" behind some shrubbery into the yard of the last house on that side of the block. After asking a neighbor to write down the license number of the truck, Mrs. Hodges drove back into her driveway and called the Tucson Police Department Crime Check number. Mrs. Hodges' telephone call to Crime Check was recorded and a transcript of the call was admitted into evidence at the motion to suppress. She began her call by giving the following information:

"I think there's something strange going on across the street, in my neighborhood. A strange pickup truck, it's on Calle Cortez near 3823. I was leaving to take my daughter to school and the big tough

hippie-looking kind of fellow, parked the car in front of the house that's for rent. Nobody's living there, gets out, walks part of the way down the street, sees me, walks to his car, looks busy, gets back out of the car and walks into the neighbor's yard where there are no (cars)."

Mrs. Hodges also stated:

"37 East Calle Cortez. A fellow in a red plaid shirt and I got the license number of the yellow Ford Pickup with great big wheels, and the license 2KP–879, now I don't know, but it sure looks queer. There's this fellow in a mustache and a red plaid shirt. And we've been burglarized here just last week again and the neighborhood is really . . . we're sick of all this kind of stuff."

In response to Mrs. Hodges' call, a dispatcher from the Tucson Police Department radioed units in the area that a possible burglary was in progress and broadcast the following information:

" . . . suspect vehicle a yellow Ford two-king-paul 879 suspects two number five males and their twenty with long hair . . . one wearing a red plaid shirt, mustache . . . three adam five four . . ."

As can be seen from the foregoing transmission the dispatcher for some unknown reason stated that there were two suspects instead of the one suspect described by Mrs. Hodges.

Detectives Parrish and Aldridge who were a few blocks away responded to the call as did a uniformed officer, James Cromwell. The detectives arrived first and met Mrs. Hodges in the middle of the street. She related to them ·essentially what she told Crime Check. Furthermore, she told them that she had never seen Nichols in the neighborhood before and he didn't fit in the area. She also said that when Nichols became aware that she was watching him, he ducked into the yard of the house located at 3806 East Calle Cortez.

The detectives left Mrs. Hodges and walked towards the house at 3806 East Calle Cortez. They were joined by the uniformed officer, Cromwell. As the officers walked into the front yard they saw Nichols sitting on the front stoop of the house. He was wearing a red plaid shirt, blue levis and a Harley-Davidson snap brim cap pulled down to his eyebrows together with a pair of large sunglasses with amber frames and brown lenses. A red bandana was tied around his head and knotted in front. His hair was long and Detective Parrish recognized it as being a wig. One of the officers testified that it appeared to him that Nichols was wearing a costume. The detectives showed Nichols their police identification and asked him for identification. He replied by stating either that he did not have any or that he did not have to show them any identification. Detective Parrish asked him more than once what he was doing at the house. Nichols finally replied that it was "none of your fucking business". In response to additional questioning Nichols replied that he was "waiting for a friend". When asked what the friend's name was, Nichols said that he had forgotten it. The detectives then asked if his friend was expecting him. Nichols replied in the negative. When asked if he lived there, Nichols said that he did not. When asked why he parked a block away, Nichols denied that he had done so and when asked if it was his truck that was parked up the street, Nichols replied that it was not.

Several times throughout the conversations, questions had to be repeated more than once as Nichols would not answer initially. When Nichols was asked where the other man was, he stated that there was not any one else. In view of the circumstances and the responses made by Nichols the detectives believed that a burglary was in process and asked Nichols to stand. One of the officers testified that because of Nichols' belligerency he felt that a physical encounter was going to take place. Both

Parrish and Aldridge began a pat-down and Aldridge felt the butt of a revolver protruding from Nichols' belt. The detective then removed a snub-nosed .38 from under Nichols' shirt. A further search at the scene revealed a small vial of cocaine in Nichols' front pocket.

Detective Aldridge then went around to the backyard of the house and spotted another individual who had apparently just exited from the backyard. Aldridge ordered him to stop. The person immediately took off, running into the alley behind the residence. This individual was subsequently caught by Aldridge, brought around to the front of the house and taken into custody.

At the motion to suppress, the owner of the house at 3806 East Calle Cortez testified that he knew Nichols. It was further brought out that Nichols was bald.

Nichols contends that there was no justification for the stop and frisk. In particular, he points out that the house at 3806 East Calle Cortez was protected by a burglar alarm system and that prior to the stop and frisk the detectives should have inspected the premises to see if the burglar alarm had been tripped and if there were any signs of a burglary in progress. He further contends that he made no threatening gestures that would justify the frisk or a belief that he was armed, noting that Officer Cromwell stated that he did not feel threatened by Nichols.

As far as the initial interrogation of Nichols is concerned we quote with approval from the case of *People v. Mathis,* Colo., 542 P.2d 1296 (1975) at p. 1298:

" . . . Officer Lopez had reasonable cause to detain the defendant after receiving the radio dispatch relating a citizen's fear and concern over the suspicious activities of the occupants of the car parked outside her home. A reliable informant's tip can be a reasonable basis for making an investigatory detention. *Adams v. Williams,* 407 U.S. 143, 92 S. Ct. 1921, 32 L.Ed.2d 612 (1972); *People v. Lucero,* 182 Colo. 39, 511 P.2d 468 (1973). In this case, the record reveals that the citizen informant who identified herself and who voluntarily reported the suspicious activity, was not a covert, undercover informant likely to fabricate information in return for immunity or other compensation. [Citations omitted]. Upon such a trustworthy tip, the officers would have been derelict in their duty if they had not detained the defendant and his passengers to check their identity and the nature of their activity."

The evasive answers of appellee, his attire, the location where he parked the truck, the denial that the truck was his, and the denial that there was another person with him, coupled with Parrish's knowledge of the high burglary rate in the area, could well justify a reasonably prudent police officer in believing that a burglary was in progress. A police officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances, would be warranted in the belief that his safety or that of others was in danger. *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968). Here, the officers were faced with an apparent burglary in progress. It is reasonable for officers to believe that a burglar may be armed with weapons, or tools such as knives and screwdrivers which could be used as weapons, and that a pat-down search is necessary for the officers' safety. *People v. Myles,* 50 Cal.App.3d 423, 123 Cal.Rptr. 348 (1975).

Appellee's contention that the officers should have determined whether the burglar alarm had been tripped and should have inspected the premises for visible signs of entry before interrogating and frisking him is without merit. First of all, an inspection as advocated by appellee would not reveal whether or not a burglary was in progress. Secondly, the Constitution of the United States does not mandate

that law enforcement officers play "russian roulette" with their lives.

The order granting the motion to suppress is vacated and the case is remanded for further proceedings.

KRUCKER and HATHAWAY, JJ., concur.