**UNITED STATES**

v.

**Airman Basic Mark F. YANDELL, FR 549–08–5700 United States Air Force.**

**ACM 23308.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 24 July 1981.

Decided 2 April 1982.

Appellate Counsel for the Accused: Colonel George R. Stevens and Captain William H. Lamb. Captain James R. Marshall filed a brief on behalf of the accused.

Appellate Counsel for the United States: Colonel James P. Porter and Captain Michael J. Hoover.

Before HODGSON, C. J., POWELL, Senior Judge, and MILLER, Appellate Military Judge.

## DECISION

HODGSON, Chief Judge:

Contrary to his pleas, the accused was convicted of housebreaking, larceny, damaging government property, damaging private property and wrongful possession of marijuana in violation of Articles 130, 121, 108, 109, and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 930, 921, 908, 909, 934.* He was sentenced to a bad conduct

* He was acquitted of additional allegations of housebreaking, larceny, and damaging government property. The convening authority set

discharge, 18 months confinement at hard labor, and total forfeitures.

## I

On Altus Air Force Base, Oklahoma, during the early morning hours of 1 March 1981, a Sunday, the accused was seen carrying a large cardboard box and running from building to building always keeping in the shadows. When he came to a lighted area he would run across it to a shadowed area keeping as close to the building as he could.

This behavior was relayed to a police patrol and caused the accused to be stopped and questioned by Airman First Class Lash and Airman Williams, two security policemen. The accused was asked for his ID card which he produced. The box he was carrying was partially open and Lash could see a "brown bottle with a white cap and an obscured label" that looked like "a pill bottle." The accused was told to keep his hands out in the open, and asked what was in the box. He indicated "personal stuff," and when Lash reached into the box he found a speaker. The accused, at the same time, also reached into the box and removed a plastic bag. A pill bottle then fell out that contained various assorted pills.

The flight chief, Staff Seargeant Dover, who was nearby, was informed and came to the scene. He immediately "frisked" the accused and discovered a screwdriver in his left sock, a butter knife, a bent fork, a bent bobby pin, and a plastic medical center pharmacy card belonging to Sergeant Garfield, a security policeman. The accused was apprehended and taken to Security Police Headquarters.

Subsequently, a security police team discovered the base hospital pharmacy had been broken into with considerable damage done to the pharmacy itself and to equipment owned by the Automated Prescription Systems but leased to the United States for use in the Altus Air Force Base Hospital.

aside an additional finding of guilty of wrongful possession of marijuana.

## II

Initially, appellate counsel contend that the "stop and frisk" search of the accused on 1 March 1981, which included a box he was carrying, was too broad and the drugs found during the search were unlawfully discovered thus infecting the proof of all the remaining proved offenses.

The "stop and frisk" doctrine first announced in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), is codified in Mil.R.Evid. 314(f)(1) and (2). The pertinent provisions of this rule state:

RULE 314. SEARCHES NOT REQUIRING PROBABLE CAUSE

(f) Frisks incident to a lawful stop.

(1) Stops. A person authorized to apprehend by paragraph 19a of this Manual and others performing law enforcement duties may stop another person temporarily when the person making the stop has information or observes unusual conduct that leads him or her reasonably to conclude in light of his or her experience that criminal activity may be afoot. The purpose of the stop must be investigatory in nature.

(2) Frisks. When a lawful stop is performed, the person stopped may be frisked for weapons when that person is reasonably believed to be armed and presently dangerous. Contraband or evidence located in the process of a lawful frisk may be seized.

This Rule recognizes two threshold conditions that must be present before the "stop" provision can be invoked. They are: the individual making the "stop" must be authorized to apprehend pursuant to paragraph 19a of the Manual for Courts-Martial, 1969 (Revised edition), or performing law enforcement duties; and (2) the individual making the stop must have information that allows him to reasonably conclude that criminal activity may be afoot.

■ The first condition is clearly present as the "stop" was made by two security policemen on patrol. The second condition is also clearly met. It is not nec-

essary that the individual making the "stop and frisk" be the one who observed the questionable activity. He may rely on information obtained through police channels. *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); see *United States v. Hernandez*, 486 F.2d 614 (7th Cir. 1973). Finally, did the accused's actions justify a limited investigatory stop? We find they did. The police officers in this case, were aware of sufficient facts to justify a reasonable belief that the accused might be engaged in criminal activity. Carrying a large box during the pre-dawn morning while carefully staying in the shadows logically arouses the suspicion of any alert police officer. *Commonwealth v. Wascom*, 236 Pa.Super. 157, 344 A.2d 630 (Pa.1975); see *Piantodosi v. State*, 311 So.2d 742 (Fla.App.1975).

■ The "frisk" provision of Mil.R.Evid. 314(f)(2) permits the stopped person to be searched for weapons if it is reasonably believed that he is armed and dangerous. The police need not be absolutely certain that the individual detained is armed for the purposes of frisking that person for weapons. The test is whether a reasonably prudent man in those circumstances would be warranted in a belief that his safety was in danger. *State v. Nichols*, 26 Ariz.App. 455, 549 S.E.2d 235 (1976); *State v. McZorn*, 288 N.C. 417, 219 S.E.2d 210 (1975).

■ Airman First Class Lash testified his reason for looking into the box was "curiosity and for my protection." When asked "what do you mean by your protection?", Lash responded:

A: Well, sir, no matter how slight the incident is, you're always curious as to what's going to happen, because you never know what is going to happen. You always take everything for granted, you know. You always hear about these guys ... just for stopping somebody for a traffic violation, and then get shot, you know, and you never know what's going to happen next. I'm nervous every time I stop somebody, no matter how slight it is.

In our view, Lash acted as a reasonably prudent man would under like circumstances. As the New Jersey Superior Court, Appellate Division observed in *State v. Dennis*, 113 N.J.Super. 292, 273 A.2d 612 (1971), a police officer is not constitutionally required to wager his physical safety against the odds that a suspect is not armed.

■ Since the initial stop of the accused was reasonable and the policeman was justified in searching the accused for a weapon, may he also examine the box the accused was carrying? In discussing this issue it is helpful to review *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), dealing with the search of an area incident to arrest. The Supreme Court there permitted a search of the arrestee's person and the area "within his immediate control"; these terms were construed to mean the area from within which he might gain possession of a weapon. Certainly a partially opened box is capable of concealing a gun, knife or club which would be readily available for use. Federal decisions reflect a trend toward allowing a "stop and frisk" search to be expanded to include purses, packages, etc., that are within the detainee's control. Some examples are: search of box held by suspect, *United States v. French*, 414 F.Supp. 798 (W.D.Okla.1976); search of purse of arrestee's companion, *United States v. Vigo*, 487 F.2d 295 (2d Cir. 1973); search of camera case at feet of suspect, *United States v. Riggs*, 474 F.2d 699 (2d Cir. 1973); search of camera case carried by arrestee, *United States v. Moore*, 463 F.Supp. 1266 (S.D.N.Y.1979).

In our view, the search of the box was not unreasonable as a part of the frisk conducted by Lash and Dover. Further, the discovery and seizure of the drugs in the box was inevitable. Once the frisk was completed, probable cause existed to apprehend the accused and a search incident to that apprehension would unquestionably have encompassed the box. *United States v. Kozak*, 12 M.J. 389 (C.M.A.1982). The military judge correctly denied the motion to suppress the evidence that was discovered.

### III

■ Appellate defense counsel assert that the housebreaking of the hospital pharmacy (Specification 2 of Charge I) and the damage to government property (Specification 2 of Charge III) are not separate offenses for sentencing. They make the same assertion regarding larceny (Specification 2 of Charge II) and damage to private property (Specification of Charge IV). They argue that the paired offenses were generated by a single impulse and were a continuous transaction, hence, each pair was a single offense for punishment.

The appellate courts have not fashioned a single test for determining whether offenses are separately punishable. An Army Board of Review held that the test for determining if offenses are separate for punishment purposes is whether each offense requires proof that is not required for the other. *United States v. Miller*, 38 C.M.R. 486 (A.B.R.1967); *pet. denied*, 38 C.M.R. 441. The courts have also relied upon the existence of separate societal norms in deciding that offenses are separately punishable. *United States v. Beene*, 4 U.S.C.M.A. 1977, 15 C.M.R. 177 (C.M.A. 1954).

Under any test discussed the offenses are separate. Each paired offense requires proof not needed for the other. Applying the societal norms test, housebreaking is an offense against habitation, larceny is an offense against personal property, and damaging property, government or private, is an offense fashioned to protect personal property from destruction or damage. Accordingly, we find the offenses were separate for sentencing. *Accord United States v. Harrison*, 4 M.J. 332 (C.M.A.1978); *United States v. Rose*, 6 M.J. 754 (N.C.M.R. 1978).

### IV

■ Finally, the accused urges that although the damaged pill dispensing machine belonged to the Automated Prescription Systems, it had been leased to the

United States Government. In their view, this arrangement made the dispensing equipment military property of the United States and not personal property of the Automated Prescription Systems. Therefore, they contend it was error to allege the offense as "damage to personal property." Cf. *United States v. Geisler*, 38 C.M.R. 530 (A.B.R.1966).

A lease is an arrangement by which exclusive possession of property is given for a limited period. *Cooperative Bldg. Materials v. Robbins and Lackey*, 80 Cal.App.2d 832, 183 P.2d 81 (Cal.1947). It does not divest ownership. Since Automated Prescription Systems owned the equipment that was damaged, and Article 109, Uniform Code of Military Justice, 10 U.S.C. § 909 proscribes the willful and wrongful destruction of the personal property of another, the challenged specification states an offense and was properly alleged, even if by virtue of its *use* the property might also constitute military property of the United States.

We have considered the remaining assignments of error and those specified by the accused and have resolved them adversely to him. Accordingly, the findings of guilty and the sentence are

AFFIRMED.

POWELL, Senior Judge, concurs.

MILLER, Judge, dissenting:

I respectfully dissent.

All findings of guilty, here, save one (possession of marijuana), were based upon evidence resulting from a "frisk" conducted after a lawful "stop." Because I believe the "frisk," as conducted in this case, violated the accused's Fourth Amendment rights, I would set aside each finding of guilty stemming therefrom.

According to the record of trial, the security policeman (S.P.) who initiated the "stop," first spotted the accused walking through a parking lot carrying a box. The S.P.'s suspicions had become aroused because the accused appeared to be hurrying from shadow to shadow, seemingly attempting to avoid detection.

Having approached the accused from behind, the S.P. asked the accused to stop and put down the box. The accused turned ninety degrees, put the box down, and then turned another ninety degrees to face the S.P.

At this point, the accused put his hands in his pockets. He immediately removed them when the S.P. requested him to do so. When asked by the S.P. to produce identification, the accused initially hesitated. But when the S.P. repeated the request, the accused reached in his pocket and handed an ID card to him.

After the ID card had been returned, the S.P. looked toward the box. Upon noticing it contained what appeared to be a pill bottle, the S.P. asked the accused what the box contained. The accused responded, "Some personal stuff." The S.P. then walked closer to the box.

Upon the S.P.'s arrival at the box, the accused put his hands back in his pockets. He was again asked to withdraw them, and did. Having assumed a position on the opposite side of the box from the accused, the S.P. peered down into it, looking at the pill bottle, once again.

According to the S.P.:

> . . . I bent down over the box, I grabbed a speaker, he grabbed the plastic bag. We both took them out—I took the speakers out, he took the plastic bags out.

At that time the S.P.'s partner came up and the "stopping" S.P. asked the accused where he got the box. After some additional conversation, the S.P.'s supervisor arrived and took over. For the first time since the initial "stop," this supervisor conducted a clothing, pat-down type "frisk" of the accused.

In response to a defense question concerning what crimes the accused was suspected of prior to the time the "stopping" S.P. reached into the box, the "stopping" S.P. responded:

> I didn't suspect any real crime. I looked in the box because I was curious and for my protection.

When the military judge later pursued this matter, he elaborated as follows:

Q. Why were you looking in the box? What was your purpose?

A. Curiosity and for my protection.

Q. Okay, what do you mean by your protection?

A. Well, sir, no matter how slight the incident is, you're always curious as to what's going to happen, because you never know what is going to happen. You always take everything for granted, you know. You always hear about these guys, cops who get stopped, just for stopping somebody for a traffic violation, and then get shot, you know, and you never know what's going to happen next. I'm nervous every time I stop somebody, no matter how slight it is.

Q. Did you contemplate telling the accused to move away from the box?

A. If there was anything funny gonna happen. The individual was nervous at the time, you know, shaking. I was too, I always kind of shake whenever I speak to somebody. The individual was cooperative with me. After I asked him the second time about his ID card he cooperated you know and when I walked over to the box he walked over. He took out garbage bags right along with me and it was just you know at the same time. I was watching his movements to be sure he didn't put his hands in his pockets again. Like if I'd ask him . . .

Q. Well, I guess my question is, if you had some reason to suspect there might be weapons in there why did you let the accused reach into the box?

A. I was new then.

Having stated those facts which are relevant to my opinion in this case, I turn now to an examination of relevant military law.

Military Rule of Evidence 314(f), which currently controls "stop" and "frisk" procedures within the Air Force, is a codification of judicial principles originally enunciated by the United States Supreme Court in

*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

Part 1 thereof provides:

(1) STOPS. A person authorized to apprehend by paragraph 19a of this Manual and others performing law enforcement duties may *stop* another person temporarily *when* the person making the stop has information or observes unusual conduct that leads him or her *reasonably* to conclude in light of his or her experience that *criminal activity may be afoot.* The purpose of the stop must be investigatory in nature. [Emphasis added.]

Mil.R.Evid. 314(f)(1).

Clearly, this rule requires that before the fruits of a "stop" may be introduced into evidence at a court-martial, the Government must shoulder the burden of demonstrating that, at the time of such a "stop,"

Based upon the whole picture the detaining officer(s) [had] . . . a particularized and objective basis for suspecting the particular person stopped of criminal activity.

*United States v. Cortez*, 449 U.S. 411 at 417–418, 101 S.Ct. 690 at 695, 66 L.Ed.2d 621 at 629 (1981).

Part 2 of the Rule provides:

(2) FRISKS. When a lawful stop is performed, the person stopped may be frisked for *weapons when* that person is *reasonably* believed to be *armed and presently dangerous.* Contraband or evidence located in the process of a lawful frisk may be seized. [Emphasis added.]

Mil.R.Evid. 314(f)(2).

Prior to addressing the burden that this portion of the Rule places upon the Government before fruits of such "frisks" can be admitted into evidence at trial, I point out the following principles enunciated by the United States Supreme Court in the cases upon which Mil.R.Evid. 314 is based:

■ The sole justification of the search [frisk] in the present situation is the protection of the police officer and others nearby, and it must be confined in scope

to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer;

*Terry v. Ohio, supra,* 392 U.S. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 911.

■ The police officer is not entitled to seize [stop] and search [frisk] every person *whom he sees on the street or of whom he makes inquiries.* Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous;

*Sibron v. New York, supra,* 392 U.S. at 64, 88 S.Ct. at 1903, 20 L.Ed.2d at 935.

[and, 3.] The search [frisk] for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault.... [Such a search must be] reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man.

*Id.,* 392 U.S. at 65, 88 S.Ct. at 1904, 20 L.Ed.2d at 936.

Ergo, before the fruits of a "frisk" may be introduced into evidence at a court-martial, the Government must shoulder the burden of demonstrating that, (1), at the time of such a "frisk" the police officer conducting it was aware of "particular facts" from which he could "reasonably have inferred" that the individual legitimately "stopped" was both "armed" and "dangerous" and (2) that the "scope" of the "frisk" actually conducted was "reasonably" limited to the purpose of "disarming a potentially dangerous man."

While this record of trial reflects the Government, met its burden of establishing the legitimacy of the "stop," it just as clearly reflects that the Government did not establish the legitimacy of any "frisk" ensuing from that "stop."

As previously noted, the essence of the "stopping" S.P. testimony in this case was that he had no *particular* facts from which he could have reasonably inferred that the accused was either armed or presently dangerous at the time he stooped over and began removing the contents of the box the accused had been carrying. To the contrary, he indicated that if he drew any such inference at all, it resulted, rather, from a combination of his inexperience and his own generalized fear that *anytime* he "stops" *any individual,* for "no matter how slight the incident," he might "get shot."

In determining whether the S.P. acted reasonably in "frisking" the accused:

... due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."

*Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909.

The S.P.'s "frisk" of the accused in this instance was not based upon the required specific reasonable inferences. Consequently, it violated the accused's Fourth Amendment rights. Since a number of the findings, here, were based upon evidence stemming from the results of this frisk, they must be set aside.

Finally, even assuming *arguendo* that adequate grounds did exist to "frisk" the accused for weapons, the scope of the "frisk" actually conducted in this case was so unrelated to the justification of "disarming a potentially *dangerous* man" as to render any fruits thereof inadmissible.

Again, referencing the essence of the stopping S.P.'s testimony, the record reflects that at the time of the "stop," the S.P. had two separate and distinct concerns; one, relating to the accused's pockets, and, one, relating to the box. The S.P.'s concern with the accused's pockets related to his generalized personal fear that any "stopped" person might shoot him. His concern with the box, on the other hand, was investigatory, totally unrelated to the personal safety of himself or others.

Thus, after spotting a "pill bottle" in the box, he walked over to it, positioning himself on the side of the box opposite the accused. When the S.P. approached the box he allowed the accused to "walk over" to it at the same time. Both, then, stooped over the box. The S.P. grabbed a speaker and, "He (the accused) took out garbage bags right along with me and it was just at the same time." But, "I was watching his movements to be sure he didn't put his hands in his pockets again."

Such actions on the part of the S.P. during his search of the box in this case are so totally inconsistent with the justification of "disarming a potentially dangerous man," required to legitimize such a search, as to render such an assertion ludicrous.

> Suffice it to note that such a search [a "frisk" following a "stop"], unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime.

*Terry v. Ohio, supra,* 392 U.S. at 29, 88 S.Ct. at 1884, 20 L.Ed.2d at 910–911.

The search of this box constituted an unauthorized search for evidence of a crime, not a legitimate "frisk" for weapons.

There being no evidence of record to indicate that, upon his arrival, the "stopping" S.P.'s supervisor had knowledge of any additional particular facts that might have enabled him, as opposed to the "stopping" S.P., to reasonably infer that the accused was armed and presently dangerous, the pat down search conducted by him was also illegal.

I would set aside all findings of guilty, except for those of the Additional Charge and its specification, and having done so, reassess the sentence.