113 N.J. Super. 292 (1971)
273 A.2d 612
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WARREN E. DENNIS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 23, 1970.
Decided February 3, 1971.
*293 Before Judges CONFORD, KOLOVSKY and CARTON.
Mr. Edward Weisslitz, Assistant Deputy Public Defender, argued the cause for appellant (Mr. Stanley C. Van Ness, Public Defender, attorney).
Mr. George N. Pappas, Assistant Prosecutor, argued the cause for respondent (Mr. Denis A. Cipriano, Assistant Prosecutor, on the brief; Mr. Joseph P. Lordi, Essex County Prosecutor, attorney).
The opinion of the court was delivered by CARTON, J.A.D.
Defendant appeals from a conviction for possession of heroin. The principal ground he urges *294 for reversal is that the 22 glassine envelopes of heroin seized from his person should have been suppressed as the product of an illegal search.
Officer Daniano testified on the motion to suppress that he and Officer Fitzsimmons went to the Tichenor Street area of Newark on July 12, 1969 to locate one Arlene Cruz, sought as a material witness in connection with a homicide. (At the trial Officer Fitzsimmons added that she had also been identified as a suspect in that killing). The officers took Miss Cruz to headquarters between 9:00 and 9:30 that evening. An hour later they returned to the same area on the lookout for another suspect in the same killing. Fitzsimmons testified at the trial that he guided the patrol car slowly along the street as Daniano made a visual search for the murder suspect. As the car came near to defendant, Dennis walked toward it, saying in a tone described by Daniano as "boisterous": "What did you do with my girlfriend?" The officers knew defendant to be Miss Cruz's boyfriend.
Daniano described what transpired as Dennis approached the car:
He put his hand in his pocket, and I had jumped out of the car and took his hand out of his pocket. Fearing that he might have a weapon, I took his hand out and searched him and I got the 22 decks of heroin.
The search referred to in the testimony was an examination of the pocket into which defendant had thrust his hand.
On cross-examination Daniano averred that defendant's hand was in his right pocket. When he pulled Dennis' hand out of the pocket, it "came out empty." The heroin was found when Daniano put his hand in that same pocket. Daniano testified further:
Q * * * I asked you if you patted him down.
A Yes, yes.
* * *
*295 Q Now, Officer, in your search, you were searching for a weapon, correct?
A That's correct, yes.
Q You thought he had a gun, is that correct?
A Yes.
Q Did you put your hand in that right-hand pocket?
A Yes, I did.
Q Did you put your hand in there first, or did you pat him down first?
A To be honest with you, I don't remember what I did. I did it, you know, very fast.
Defendant's version was that he and his girlfriend, Miss Cruz, had been standing outside a bar. The police drove up, summoned her to the patrol car and took her to headquarters for questioning because she had been with "this girl that got killed." Returning about an hour later, the police informed him that Miss Cruz had not given a statement and enlisted his help in obtaining one from her. He went to headquarters but was unable to persuade Miss Cruz to give a statement. Dennis claimed that he was then taken to the bull pen and informed that the police had found 22 decks (of heroin) on him. He insisted that he had not been searched until after he was placed in the bull pen and that he possessed no narcotics at that time.
The court denied the motion to suppress, finding the factual situation as depicted by Daniano.
At the trial Daniano gave virtually the same testimony as he had given at the hearing on the motion. As to the sequence of events, he stated he first removed defendant's hand from the pocket. Thrusting his own hand into the same pocket, he found the glassine envelope. He then conducted a pat-down search. He could not remember whether he grabbed defendant's hand from the side or from behind, since his actions were spontaneous.
Officer Fitzsimmons substantially corroborated Daniano's account. He testified that defendant was "hollering to us, `Where is my girlfriend, what did you do with my girlfriend?'" Fitzsimmons believed that the man had a weapon in his right pants' pocket. His observations of Dennis' conduct *296 at that point prompted him to warn Daniano, "Be careful. He has his hand in his pocket."
The trial court impliedly found that Daniano acted out of fear for his personal safety in making the search which resulted in the discovery of the heroin, and that the search and seizure were legally unobjectionable. We agree.
The question before us is whether the trial court was justified in determining that Officer Daniano acted with reasonable prudence and, if so justified, whether the steps the officer took to neutralize the threat of physical harm were reasonable. More precisely, the question is whether the circumstances confronting this officer were of such an emergent and menacing nature as to justify a reasonable belief on his part that it was necessary for his safety to seize the object thought to be a gun without preliminarily frisking Dennis.
In examining the factual situation, we must bear in mind that a police officer is not required to be a constitutional lawyer. In assessing the quality of his behavior or reaction, "the common and specialized experience and work-a-day knowledge of policemen must be taken into account" and the entire transaction reviewed "in a common-sense and realistic fashion." State v. Contursi, 44 N.J. 422, 431 (1965).
The officers were in the process of investigating a homicide which they believed to be murder. Earlier that evening, in that same area, they had picked up defendant's girlfriend and had taken her to headquarters for interrogation. As defendant said, "Miss Cruz had been with the girl that was killed." The police had just returned from questioning her. Not only was defendant's girlfriend a possible witness to the killing, but also her name had been mentioned to the police as a suspect. The policemen were in the process of seeking out another suspect in the same crime.
The hour was late  the area one of high crime intensity. Dennis' inquiry as to the whereabouts of his girlfriend bristled with hostility. Considered against this backdrop, defendant's *297 confrontation with the two officers, his less than patient approach toward the patrol car, and the movement of his hand to his pocket could reasonably have been interpreted to evidence an intent to inflict immediate bodily harm. The situation was pregnant with the probability of danger. Common sense compelled the officers to act for their own safety.
One of the well-established exceptions to the general requirement of a search warrant is when the attendant circumstances are exigent or emergent. See Warden v. Hayden, 387 U.S. 294, 298-300, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Chapman v. United States, 365 U.S. 610, 615, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); McDonald v. United States, 335 U.S. 451, 454-455, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Johnson v. United States, 333 U.S. 10, 14-15, 68 S.Ct. 367, 92 L.Ed. 436 (1948). We believe that rule clearly applicable here.
The Constitution does not require an officer to wager his physical safety against the odds that a suspected assailant is actually unarmed. The United States Supreme Court has adverted to the standard of conduct to which the police must adhere in the face of apparent danger. In establishing guidelines, the court took cognizance of the violence which may be directed against a police officer in the performance of his duties and the need for law enforcement personnel to guard against it.
* * * Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded.
Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.
In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would *298 appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. [Terry v. Ohio, 392 U.S. 1, 23-24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)]
* * * The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. [Citations omitted] And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or "hunch," but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. [citation omitted] [Id. at 27, 88 S.Ct. at 1883]
See also State v. Dilley, 49 N.J. 460 (1967).
The officer's action of grasping defendant's hand as defendant bore down on him is beyond reproach. If he believed (as we are of the opinion he was reasonably entitled to believe) that defendant had a weapon in the pocket where his hand was stationed and was about to use it, then the officer was entitled to prevent the anticipated attack in this fashion. This conservative method of self-protection would seem preferable to that of drawing his own gun or taking the offensive in some other manner in the face of the poised attack. Retreat would be incompatible with his responsibility as a police officer. He was compelled to act.
We are not persuaded that once the officer succeeded in removing defendant's hand from his pocket he had the right to proceed only with a pat-down search. This argument is projected on the theory that the apparent threat to the officer's safety had been then averted or suspended and he was relegated to take procedures less intrusive on defendant's privacy. It is based, too, on the assumption that each motion during the factual complex can be isolated from another and examined individually. We consider such an approach totally unrealistic. It seeks to divide an instantaneous reaction into segments separable one from another and to replay the scene in slow motion with the benefit of a stop-action camera. Such isolation of motion suspended in time and place distorts the tempo and the reality of the situation.
*299 The search involved a reflex reaction to the threat of danger  an attempt to disarm an assassin. Reaching inside the pocket in the expectation of seizing a gun was part and parcel of that reaction. This was not merely a precautionary probe of a person suspected of generalized criminal activity. Nor was the transaction one in which the officer had the opportunity to reflect on possible alternative courses of action. Under these circumstances the police officer was not limited to conducting a pat-down or frisk as to that pocket in which the weapon was believed to be located.
The situation confronting Officer Daniano bears no resemblance to that described in Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1912, 20 L.Ed.2d 917 (1968). There the court held that the officer was not motivated by fear for his personal safety, but was desirous of securing evidence of crime. The court then considered the scope of the search:
Even assuming arguendo that there was adequate grounds to search Sibron for weapons, the nature and scope of the search conducted by Patrolman Martin were so clearly unrelated to that justification as to render the heroin inadmissible. The search for weapons approved in Terry consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault. Only when he discovered such objects did the officer in Terry place his hands in the pockets of the men he searched. In this case, with no attempt at an initial limited exploration for arms, Patrolman Martin thrust his hand into Sibron's pocket and took from him envelopes of heroin. His testimony shows that he was looking for narcotics, and he found them. The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception  the protection of the officer by disarming a potentially dangerous man. Such a search violates the guarantee of the Fourth Amendment, which protects the sanctity of the person against unreasonable intrusions on the part of all government agents. [at 65-66, 88 S.Ct. at 1904]
Terry and Sibron are concerned with the limits of the investigation of generalized suspicious behavior and the precautionary measures available when that behavior could reasonably lead the officer to believe that his safety could be endangered. In the words of the court in Terry,
*300 We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. [392 U.S. at 23, 88 S.Ct. at 1881 emphasis added]
This was not a search initiated by an officer to uncover weapons that could be unexpectedly used against him. It was not an exploratory or preliminary course of action adopted for the purpose of assuring himself that the man was unarmed. It involved affirmative steps intended to disarm one believed to be an assailant. It was a reaction to the threat of an imminent attack expected to originate from a specific point.
The present case resembles in some respects that before the court in People v. Taggart, 20 N.Y.2d 335, 283 N.Y.S.2d 1, 229 N.E.2d 581 (Ct. App. 1967), app. dism. 392 U.S. 667, 88 S.Ct. 2317, 20 L.Ed.2d 1360 (1968). There the police received an anonymous telephone tip that a man fitting a particular description was carrying a pistol in his left-hand jacket pocket. An officer went to investigate, observed a man fitting the description at the designated location, and thrust his hand into his jacket pocket. No frisk or pat-down preceded the search of the pocket. The officer testified that he observed no bulge prior to the search and that he had never seen defendant before that time. There is no indication that the police officer thought he was in immediate danger.
The court upheld the search although the search exceeded the limitations set out in that court's prior decisions.
Even assuming that under normal circumstances the "search" allowed by section 180-a should be limited to a "frisk," the action of the detective in this case was proper, because of the additional circumstances. Delaney had a reasonably based suspicion not only that defendant was carrying a pistol but also that the weapon was located in his left-hand jacket pocket. It would seem unreasonable to require an officer in that situation to engage in a preparatory and undoubtedly dangerous frisk  particularly in view of the fact that defendant *301 was standing in the middle of a group of children at the time of the search. [283 N.Y.S.2d at 8, 229 N.E.2d at 586]
The procedure followed by the officers which resulted in the discovery of the heroin was not violative of the Fourth Amendment.
Defendant advances several additional grounds for reversal  all under the "plain error rule." We find no merit in any of them.
Affirmed.