[No. 1755-2.  Division Two.  November 26, 1975.]

THE STATE OF WASHINGTON, *Respondent*, v. PEDRO SERRANO, *Appellant.*

*Samuel W. Fancher* (of *Conrad & Johnson*), for appellant.

*Donald Herron, Prosecuting Attorney,* and *Joseph D. Mladinov, Special Counsel,* for respondent.

PEARSON, J.—Defendant, Pedro Serrano, appeals his jury conviction of two counts of unlawful possession of a controlled substance. The sole issue on appeal is the admissibility of a small, translucent container found to contain several amphetamine and LSD pills. Defendant contends the container should have been suppressed as the product of an unconstitutional search and seizure. We hold the trial court properly admitted the container into evidence and affirm the conviction.

Officers Margeson and Young of the Tacoma Police Department were patrolling a residential area shortly before 1 a.m. on May 12, 1974. They passed a completely darkened house just as a 1957 Chevrolet began backing out of the driveway. They observed the Chevrolet had a broken wing window on the passenger side, and two occupants were visible in the front seat. As they passed, the passenger "appeared to be stuffing something underneath the front seat of the car." It struck the officers also that they had never before seen the car in the neighborhood and it "didn't belong" there. The police car continued for a block and pulled over to let the Chevrolet pass. Officer Margeson testified at a pretrial suppression hearing that they then stopped the car because of

> [t]he lateness of the hour, the occupants appeared to be juveniles,[1] and the car had a broken right wing window, which could possibly indicate to us it had been tampered with or stolen, the general neighborhood that the car came out of, the car didn't fit.
>
> Q Was the purpose of stopping the car to make any arrest or to do something else?
> A We were just going to stop the car, question them about what they were doing in the area, and find out who they were and who was the owner of the car.

After the stop was made, Officer Margeson went to the driver's side and asked the occupant for his operator's license. The driver produced his license, but testified he could not find his vehicle registration in the glove compartment. There was an odor of alcohol on his breath.

---

[1] The driver was 16; the passenger, Serrano, was 20.

Meanwhile, Officer Young went to defendant's side of the car and observed bottles of beer on the floorboard. The officer asked Serrano for identification and defendant replied he had none. The defendant gave his age and then complied with a request to get out of the car.[2] Defendant testified that while trying to conceal the beer he had noticed a small, plastic container "in the back" that he had never seen before. He recognized the amphetamine tablets and became concerned the police might stop the car, so he put the container in his pocket without commenting about it to his companion. This testimony contradicted defendant's oral confession, given at the police station after proper advisement of *Miranda* rights, to the effect that he carried the pills around to give to other people. In any event, when exiting the car, defendant withdrew the container from his pocket and attempted to conceal it by switching it from hand to hand behind his back. Officer Young asked what was in defendant's hands. At that point, Serrano threw the container "on the ground." It was recovered and a subsequent chemical analysis revealed its contents to be amphetamines and LSD, both controlled substances.

Defendant consistently opposed the admissibility of the pills and the confession during pretrial proceedings and at trial on the grounds there was no lawful basis for the police to stop the Chevrolet. If the initial stop was unlawful, defendant argues, then its "fruits"—the pills and the confession—should have been suppressed under the fourth amendment to the United States Constitution. *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963).

█ The pertinent ground rules for an investigatory stop of a vehicle were set out in *State v. Gluck*, 83 Wn.2d 424, 426, 518 P.2d 703 (1974), where the Supreme Court said:

---

[2]At this point, defendant could presumably have been arrested for violations of Tacoma City Code 8.20.070(b) and/or RCW 66.44.270, prohibiting the possession of liquor by minors. Apparently he was not charged with these offenses.

The stopping of vehicles for traffic or general investigation has been specifically held to be noncustodial in nature. *Lowe v. United States*, 407 F.2d 1391 (9th Cir. 1969); *Jennings v. United States*, 391 F.2d 512 (5th Cir. 1968). It has also been held that traffic enforcement officers may stop motorists for routine checks, and such stopping does not amount to an arrest or unlawful stopping. *United States v. Bonanno*, 180 F. Supp. 71 (S.D.N.Y. 1960), *rev'd on other grounds sub nom., United States v. Bufalino*, 285 F.2d 408 (2d Cir. 1960); *McCarthy v. United States*, 264 F.2d 473 (8th Cir 1959); *Smith v. United States*, 264 F.2d 469 (8th Cir. 1959). It follows, therefore that where officers entertain a well-founded suspicion not amounting to probable cause, they may stop the suspected person, identify themselves and require the suspect to identify himself and explain his activity without being adjudged to have made a formal arrest. *State v. Rankin*, 477 S.W.2d 72 (Mo. 1972); *United States v. Bonanno, supra* at 80.

In *Gluck*, the court was able to verify a "well-founded suspicion" where the police were patrolling an industrial area in Seattle which had experienced an increasing number of burglaries and, at between 4 and 5 a.m., they observed a car drive away from a parked position in front of a closed tavern.

In considering the legality of this stop, we are not unmindful that the Fourth Amendment, in providing that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, . . . " is intended to assure the privacy and security of individuals against arbitrary invasions by officials of government. *Camara v. Municipal Court*, 387 U.S. 523, 528, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967). Balanced against this is the public's interest in effective police protection that will justify certain kinds of warrantless searches and intrusions against the person. *Adams v. Williams*, 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972). Within the constitutional mandate, it is beyond question that "the right to stop, question and detain is vital to the detection of crime in our modern urban commu-

nities . . ." *United States v. Thomas,* 250 F. Supp. 771, 790 (S.D.N.Y. 1966). A temporary detention is justifiable under suspicious circumstances, to enable the policeman to determine whether to make an arrest, investigate further, or take no action if satisfied with the explanation given. *People v. McLean,* 6 Cal. App. 3d 300, 85 Cal. Rptr. 683, 686 (1970); *People v. Wigginton,* 254 Cal. App. 2d 321, 62 Cal. Rptr. 104 (1967).

We find that while the circumstances in this case fell short of probable cause for an arrest, a cursory stop was justified to enable the police to satisfy themselves the car had not been stolen or the passenger had not been concealing the spoils of a burglary of the dark house. This modest[3] intrusion was justified by the obligation of the police to inquire into suspicious activity.

We turn next to the seizure of the container of pills. Defendant's testimony concerning the events leading to the seizure was unrebutted during the suppression hearing[4] and was as follows:

Q Then what happened?
A He said I want you to step out of the car, you know, then he said I don't believe you, and then he started like searching me, you know, he grabbed for my coat pocket and I jerked back, you know, and it ripped, and I had some money in my pocket, it fell, and then like I had this container in my hand, you know, I just threw it, I didn't think he would see it.

. . .

Q [On cross-examination] Now, where was this plastic container of pills or whatever that you found at the time that you got out of the car?
A It was, they were in my hand, I had left my hand back here, you know, and he started looking in my coat, and when I jerked back like the money fell, so he bent down like, you know, I just threw it over.

. . .

Q Do you recall the officer asking you anything about

---

[3]*See United States v. Brignoni-Ponce,* 422 U.S. 873, 45 L. Ed. 2d 607, 615, 95 S. Ct. 2574 (1975).

[4]Officer Young was unavailable to testify.

what's that in your hand, anything along that line, when you had it in your hand?

A No.

Q Did you pass it from one hand to the other, or anything like that?

A Well, the only motion I did was jerked my coat back and like my pocket ripped and that's it, you know, the only motion I did, pulled my coat back and threw it, you know.

Q Did you change the hand that the pills were in at any time prior to throwing it that you recall?

A I don't know, I'm left handed, and my left pocket was ripped, so like I don't know, I must have switched hands to throw it, I had it in my right hand.

Q Were you holding your hand behind your back or in front of you, or . . .

A I had it in back of me.

The hearing judge who heard and evaluated the testimony concluded and ruled—notwithstanding defendant's characterization—that no search had occurred and that Serrano "saw fit to throw it over on the road," thus revealing the container to the officers.

It is unclear from the suppression hearing testimony where defendant's hand was when the officer "grabbed for [his] coat pocket," but it appears he was using gestures to describe the action. We believe the account is reasonably susceptible to the interpretation that Serrano had concealed his hand in his coat pocket; the officer attempted to grab the hand and in so doing tore the pocket; and Serrano then switched the container to his other hand and threw it. So construed, the testimony supports the judge's conclusion that the object was abandoned by the defendant and was not the product of a search.[5] Because the testimony before

---

[5]The testimony at trial tended somewhat to clarify Serrano's prior account and to confirm the pretrial judge's interpretation. After defendant stated he had found the container and "stuck it in my pocket," the car was stopped, and he was asked for identification and then to step out.

Q Did you step out?

A Yes. And then, like I pulled my hand out of my pocket and I still had it in my hand, and then I just kept switching it, and, you know, and he said, "What's that behind your back?" And I threw it,

the court was unclear and subject to this interpretation, we will not review the cold record and substitute a contrary inference. We find no error in the court's decision not to suppress the pills.

The applicable law is bottomed on the undisputed premise that an officer making an investigatory stop of a person, short of an arrest, may conduct a carefully limited search in an attempt to discover weapons which might be used against him. *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Such a search must ordinarily begin with a pat-down of the outer clothing for suspicious objects and cannot be a mere pretext for a search for incriminating items where the officer has no reasonable grounds to believe the citizen is armed. *Sibron v. New York*, 392 U.S. 40, 20 L. Ed 2d 917, 88 S. Ct. 1889 (1968).

The Supreme Court's reasons for approving a self-protective search in *Terry* were aptly stated at page 23:

> We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement

---

when he wasn't looking. I figured he wouldn't see it.

Q Did he put his hand in your pocket?

A Yeah.

Q Was your pocket torn as a result?

A Uh-huh.

Q What happened when your pocket was torn?

A Well, I had some money in there. I don't know if it fell or not, but—when he had his hand in there, that's when I threw it.

Officer Young's version was as follows:

A After he got out of the car and I was facing to him, talking to him, he withdrew something from his right front coat pocket and brought it behind himself, and I asked him—

Q Did you do anything then, when you saw that?

A I asked him what he had in his hands and he brought his other hand from behind him, brought out one hand and said, "Nothing," then he put it behind him and brought out the other.

officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.

In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

(Footnote omitted.)

■ In this case we are not concerned with a permissible search incident to an arrest, since an arrest had not been made. Nor did the officer conduct a "frisk" under the *Terry* doctrine, because it appears he simply had no time for such deliberate action. It may, however, be reasonably inferred from the testimony at the suppression hearing that Officer Young was reacting protectively to the furtive actions of a man who withdrew a hand from concealment in his pocket and "jerked back," thrusting the hand behind his back. We think the *Terry* rule and rationale are validly applied to authorize an officer under facts such as these to grab for a subject's hand, concealed suspiciously in his coat pocket or behind his back. *People v. Superior Court,* 15 Cal. App. 3d 806, 94 Cal. Rptr. 728 (1971); *People v. Woods,* 6 Cal. App. 3d 832, 86 Cal. Rptr. 264 (1970); *State v. Hall,* 4 Ore. App. 30, 476 P.2d 930 (1970). Such an action is not a search, but rather an officer's reflexive conduct in potential self-defense. *State v. Dennis,* 113 N.J. Super. 292, 273 A.2d 612 (1971). The right of Officer Young to react was not invalidated when it turned out, after the fact, that the hand contained contraband instead of a weapon. "The Constitution does not require an officer to wager his physical safety against the odds that a suspected assailant is actually unarmed." *State v. Dennis, supra* at 297.

We cannot in good conscience sit in the calm, reflective atmosphere of an appellate court and conclude, in an act of pointless hairsplitting, that a pat-down of the defendant incident to the stop would have been constitutional but the officer is legally precluded from attempting to seize a clenched or concealed hand to determine whether it might hold a weapon.

In conclusion, we hold that the container was recovered after abandonment by Serrano following a valid investigatory stop and a policeman's justifiable action in taking reasonable precautions to protect himself. If defendant had not discarded the object, the officer would have been justified in seizing it from the closed hand as a defensive measure. Once it was abandoned, it was likewise admissible. *See State v. Loran*, 62 Wn.2d 4, 380 P.2d 733 (1963); *State v. Davis*, 12 Wn. App. 32, 527 P.2d 1131 (1974).

The conviction is affirmed.

PETRIE, C.J., and REED, J., concur.