The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Edward HARDRICK, Defendant–Appellee.

No. 02SA67.

Supreme Court of Colorado,
En Banc.

Sept. 16, 2002.

Frank J. Daniels, District Attorney, Vincent J. Felletter, Jr., Deputy District Attorney, Grand Junction, Colorado, Attorneys for Plaintiff–Appellant.

David S. Kaplan, Colorado State Public Defender, David G. Eisner, Deputy State Public Defender, Grand Junction, Colorado, Attorneys for Defendant–Appellee.

Chief Justice MULLARKEY delivered the Opinion of the Court.

In this interlocutory appeal, the prosecution asks us to reverse a trial court order suppressing evidence seized from the defendant Edward Hardrick. While officers were searching a residence and arresting its occupants, the defendant knocked on the door. After inviting the defendant into the residence and identifying themselves as police, the officers asked the defendant to remove his hands from his pockets. The defendant kept one hand in his pocket and then began to turn away from the officers. Fearing that the defendant was reaching for a weapon concealed in his pocket, an officer grabbed the defendant's wrist. After the officer pulled his hand from his pocket, the defendant threw down two baggies of methamphetamine.

The trial court granted the defendant's motion to suppress the methamphetamine, holding that the officer lacked the reasonable suspicion necessary to justify grabbing the defendant's wrist. We reverse. We find that the strong government interest in officer and citizen safety justifies a police request that a person show his hands when that person walks into an arrest or search scene. If the person refuses to comply or makes any other furtive gesture, a limited seizure aimed solely at neutralizing any threat to officer or citizen safety is justified.

## I. Facts

Around 6:30 p.m. on an August evening, five members of the Grand Valley Joint Drug Task Force went to a residence for a "knock and talk." The officers did not have a search warrant for the address but had linked two men to the address. The men had previously fled from a car in which a pound of suspected methamphetamine and a large quantity of stereo equipment was found. A woman opened the door and a strong smell of marijuana emerged. The officers asked to speak to a resident and identified themselves as police. The woman shut and locked the door. A man, Todd Lee, then opened the door. Again, the officers smelled marijuana. The officers decided to enter the residence and Lee attempted to block the officers' entry. After pushing past Lee, the officers asked him if others were in the house. He told the officers that only two women and some children were there. The officers then found

another man who was hiding, two women, several children, marijuana, and suspected methamphetamine. Lee was arrested for obstructing government operations.

A few minutes later, two men arrived at the residence and were admitted. An officer noticed a bulge in one of the men's pockets and patted him down. A marijuana pipe was found.

Shortly thereafter, two more men arrived—the defendant, Edward Hardrick, and his companion, Richard Espino. Espino knocked on the door. An officer opened the door and invited the men to enter the residence. At this point, Hardrick had either one or both of his hands in his pockets. Once the men were inside, two of the officers identified themselves as law enforcement officers. Detective Kramer then ordered Hardrick to remove his hands from his pockets. Hardrick kept one hand in his pocket, clenched in a fist. The trial court notes that Detective Kramer and Hardrick have differing versions as to what happened next. The detective contends that Hardrick turned away from him toward another officer, that he grabbed the wrist of Hardrick's clenched hand, and that Hardrick then pulled his hand out of his pocket and threw two baggies of methamphetamine down an adjacent hallway. Hardrick contends that the detective yanked his hand out of the pocket.

Hardrick was handcuffed and arrested for possession of a schedule II controlled substance and tampering with physical evidence. Hardrick moved to suppress the methamphetamine, contending that its discovery was a result of an illegal search and seizure. Specifically, Hardrick contends that the detective lacked the requisite reasonable suspicion to order Hardrick to remove his hands and to subsequently grab his wrist. The trial court agreed. It held that Hardrick's mere presence in a crime scene does not give rise to reasonable suspicion. It further held that the atmosphere into which Hardrick walked was not a "pervasive dangerous atmosphere" and that Hardrick's "refusal to remove his hand from his pocket contributes nothing towards the existence of reasonable suspicion." We reverse the trial court's suppression of the methamphetamine.

## II. Analysis

■ In reviewing a trial court's suppression order we defer to a trial court's factual findings but review its conclusions of law de novo. *People v. Heilman*, 52 P.3d 224, 227 (Colo.2002). Here, we conclude that the trial court's findings of fact are adequately supported by the record. We reject, however, the trial court's legal conclusion that the officer's search of Hardrick was violative of Fourth Amendment principles.

■ As the United States Supreme Court established in *Terry v. Ohio*, 392 U.S. 1, 25–26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), an investigatory stop may be employed when an officer has less than probable cause. "Reasonable suspicion" is all that is required to stop and question a suspect or to pat him down in a search for weapons. *People v. Smith*, 13 P.3d 300, 304 (Colo.2000). Although the level of suspicion required for an investigative stop or pat-down is less than that needed for an arrest, it still must be judged against the reasonableness standard of the Fourth Amendment. *Terry*, 392 U.S. at 20, 88 S.Ct. 1868. In order to assess reasonableness, a court must identify the government interest allegedly justifying the frisk and balance this against the level of intrusion. *Id.* at 21, 88 S.Ct. 1868.

■ An officer may conduct an investigatory stop for questioning if (1) there is an articulable and specific basis in fact for suspecting that criminal activity has occurred, is taking place, or is about to occur; (2) the purpose of the intrusion is reasonable; and (3) the scope and character of the intrusion is reasonably related to its purpose. *Smith*, 13 P.3d at 306.

In this case the second prong—whether the purpose of the intrusion is reasonable—is not at issue. We have repeatedly stressed that a police intrusion based on officer safety concerns is reasonable. *See People v. Martinez*, 801 P.2d 542, 544 (Colo.1990); *Smith*, 13 P.3d at 307; *People v. Melgosa*, 753 P.2d 221, 225–26 (Colo.1988); *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (finding it "too plain for argument" that concern for officer

safety is "both legitimate and weighty"). Hardrick contends, however, that the officer lacked reasonable suspicion to stop and frisk him and that the scope of the search exceeded the permissible bounds.

### A. The Frisk Was Justified

 We first look to whether Hardrick's frisk was justified. To justify a stop, an officer must establish that "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868. It is well established in Colorado that when an officer believes someone may be armed and potentially dangerous, a pat-down search for weapons is appropriate. *See, e.g., People v. Jackson*, 948 P.2d 506, 507 (Colo.1997); *Martinez*, 801 P.2d at 544. In our 1990 decision of *Martinez*, we approved of a stop in circumstances similar to the ones here.

In *Martinez*, officers, who were executing a search warrant, found cocaine, handguns, rifles, shotguns, and knives in a Lakewood residence. While the search was in progress, Martinez drove up to the home and walked to the front door. Before Martinez could enter the home, an officer drew his gun and ordered the defendant to stop, raise his hands, and drop to his knees. Martinez began to follow the order but then made a sudden movement with his hand toward his pocket. He was again ordered to raise his hands and was then handcuffed. *Id.* at 543. This court noted that under the circumstances, the stop was justified:

> The record indicates that [the officer] was in the house pursuant to a "no-knock" search warrant and that a substantial amount of drugs and weapons were present. Additionally, he was presented with the scenario of an unidentified person approaching the house. He could not possibly know whether this individual was armed and dangerous without performing a pat-down search. While [the officer] had no reasonable suspicion that the defendant was involved in any crime, we conclude that under the circumstances, with drugs and weapons present in the house, [the

officer] was justified in making an investigatory stop of the defendant.

*Id.* at 544.

Hardrick attempts to distinguish *Martinez* from the current case. He notes that the officers had already found weapons at the home when Martinez arrived, but here no weapons were found. Hardrick identifies additional differences: although the officers observed Martinez walk up to the residence, Hardrick and his companion knocked on the apartment door; Martinez made a sudden move toward his pocket, but Hardrick already had his hand in his pocket. We find all but the first of Hardrick's proffered distinctions insignificant. Noticing a visitor before he reaches the front door as compared to after he knocks on the door does not provide any more or less certainty as to his purpose there or to the degree of danger. Similarly, refusing to remove a hand from a pocket does not seem any less disconcerting than reaching toward a pocket. Each raises concerns for officer safety.

 We do agree, however, that a significant difference between the scenario in *Martinez* and the one before us is the presence of weapons in *Martinez* and the absence of weapons here. Certainly, safety concerns are more acute when officers have already found a number of weapons in a home and an unidentified person enters. This difference, however, is not dispositive. All that is required is a reasonable, articulable suspicion that officer safety may be compromised. *See Jackson*, 948 P.2d at 507–08 (holding that a pat-down search of a passenger is justified when an officer stops a car for a traffic infraction and a passenger in that car makes the furtive gesture of pulling his coat from the back seat of the car onto his lap).

 We find that the circumstances of this case, taken as a whole, justify the officer's stop of Hardrick. First, although no weapons were found at the scene, drugs were found, thus increasing the risk of violence. *See Michigan v. Summers*, 452 U.S. 692, 702–703, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981)(noting that "the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden

violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation"). Second, the occupants of the house were not cooperative. This is a significant factor in determining the danger of an unknown, possible compatriot appearing on the scene. Third, Hardrick did not comply with the officer's attempts to ensure that he was not a safety threat. The trial court found that he refused to comply with the officer's requests for him to remove his hands from his pockets. Under these circumstances, a limited stop was justified.[1] "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27, 88 S.Ct. 1868.

When there is an ongoing search or arrest and a third party voluntarily arrives at the scene, it is unreasonable to ask an officer to simply send the interloper away from the immediate area and hope that he is not setting himself up for an ambush. It is equally unreasonable for the officer to allow the third party into the volatile situation without insuring that the party is not armed. *See Smith*, 13 P.3d at 307 (holding that when a second car pulled up and stopped behind a police

officer presently engaged in the traffic stop of a stolen car, the officer reasonably stopped and searched the second car to secure his own safety). The stop here was appropriate, and is quite distinguishable from a situation where an innocent passerby inadvertently happens onto a crime scene in public open space or where the police actively follow and approach an individual on a public street. *See Outlaw v. People*, 17 P.3d 150, 153–54 (Colo.2001) (finding that the police lacked reasonable suspicion to stop a man who was walking down a public street with his hand closed in a fist).

### B. The Scope of the Intrusion Was Proper

■ Hardrick also argues that even if the stop was justified, the scope of the frisk in this case was unreasonable. We disagree. As mentioned above, in order to comport with the federal and Colorado search and seizure provisions, not only must a stop be justified, but the scope of the intrusion must be reasonable. In the current case, Hardrick refused to remove his hand from his pocket. This, coupled with the other facts of this case, provided sufficient justification for the officer to respond by grabbing Hardrick's wrist to prevent Hardrick from using a weapon concealed in his pocket. The trial court did not determine whether the officer pulled Hardrick's hand out or whether Hardrick did

---

1. We note that our conclusion here is consistent with those of other jurisdictions. *See, e.g., Maryland v. Wilson*, 519 U.S. 408, 413, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (noting that the "weighty interest in officer safety" justifies ordering a passenger out of a stopped car even if the car was stopped because of the driver's infraction); *U.S. v. Michelletti*, 13 F.3d 838, 842 (5th Cir.1994)(holding that a frisk for weapons was reasonable when officers were investigating suspicious behavior behind a bar and the defendant walked out of the bar door onto the scene with a beer in his left hand and his right hand in his pocket); *People v. Glaser*, 11 Cal.4th 354, 45 Cal.Rptr.2d 425, 902 P.2d 729, 737 (1995)(holding that officers are justified in ordering, at gunpoint, a visitor to a residence about to be searched to get down on the ground and subsequently handcuff him in order to determine the visitor's connection with the residence and ensure officer safety); *People v. Roach*, 15 Cal. App.3d 628, 632, 93 Cal.Rptr. 354 (Cal.Ct.App.1971)(upholding a pat-down search of an individual who knocked on the door of a residence that was being searched when lysergic

acid (LSD) and marijuana were found prior to his arrival); *Commonwealth v. Fraser*, 410 Mass. 541, 573 N.E.2d 979, 983 (1991)(finding that a pat-down search of a man in a high crime neighborhood, who bent down as if picking something up, and approached the officer with his hands in his pockets comported with the Fourth Amendment); *State v. Dennis*, 113 N.J.Super. 292, 273 A.2d 612, 615 (1971)(holding that when a suspect's boyfriend approached the police inquiring about his girlfriend and he had his hand in his pocket, a subsequent stop and frisk was justified by officer safety concerns); *State v. Serrano*, 14 Wash.App. 462, 544 P.2d 101, 106 (1975)(holding that the *Terry* rationale authorizes an officer to grab a subject's hand, concealed suspiciously in his coat pocket or behind his back and characterizing such officer conduct as "not a search, but rather an officer's reflexive conduct in potential self-defense"). *But see U.S. v. Rembert*, 838 F.Supp. 1336, 1339–40 (D.Minn.1993)(finding that an officer lacked reasonable suspicion to conduct a pat-down search of a man who knocked on the door during the search of a residence).

so. We find that even if the officer pulled his hand out, the officer's actions were justified by the circumstances.

As the United States Supreme Court has noted, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). In the current case, the officers were confronted with a stressful arrest and search situation in which the occupants of the house had already lied to the police and where the officers had already found drugs, encountered resistance, and discovered a suspect hiding in a small utility room. When a man with his hands in his pockets entered the scene and would not comply with officer orders to show his hands, it was reasonable for the officer to grab Hardrick's hand. *Accord Martinez*, 801 P.2d at 544–45 (finding that officer safety concerns justify ordering a suspect at gun point to drop to his knees and subsequently handcuffing him); *Reyes v. U.S.*, 758 A.2d 35, 38–39 (D.C.2000)(holding that, when the defendant refused repeated requests to remove his hand from his pocket, officer safety concerns justified grabbing the defendant, pulling him over to the police cruiser and forcing him to remove his hand from his pocket and open his hand).

 Moreover, the scope of this search did not exceed that necessary to ensure officer safety. When a search is justified by officer safety concerns, it must be limited to a search for weapons, and cannot be expanded to look for evidence. *See Terry*, 392 U.S. at 29, 88 S.Ct. 1868; *Martinez*, 801 P.2d at 544. Accordingly, in *Martinez*, when a search that was justified by a legitimate concern for officer safety ended with an officer opening a small pouch filled with amphetamine, we held that the search had exceeded a reasonable scope because "no reasonable person could believe that the pouch was a weapon or that it contained a weapon." *Id.* at 545. The current case is not one in which an officer uses the pretext of a weapons search to search for other evidence. Rather,

he simply asked Hardrick to show his hands and when Hardrick refused to do so, grabbed his hand for his own safety. Once Hardrick threw packets of drugs down the hallway, they were then in plain view and the officers appropriately seized them. *See Melgosa*, 753 P.2d at 226.

 In sum, we conclude that any time an officer is engaged in a valid search or arrest and a third party inserts himself into the situation, the officer may ask the interloper to show his hands. If the individual refuses to do so, or makes any other furtive gesture, such conduct raises a reasonable suspicion that officer safety and the safety of others may be compromised. Accordingly, it is consistent with the Fourth Amendment and Article 2, Section 7 of the Colorado Constitution to briefly detain the suspect in order to defuse any danger.

The trial court's suppression order is reversed, and the case remanded.

Justice HOBBS dissents.

Justice HOBBS, dissenting:

I respectfully dissent. In my view, the trial court correctly applied Fourth Amendment principles and our case precedent to the facts of this police-citizen encounter. The trial court found that officers had secured the crime scene and no articulated danger to public safety had presented itself or justified police seizure of Hardrick.

The Majority posits the existence of drugs in the house, then associates drugs with violence, then ascribes the initial non-cooperation of persons inside the house to Hardrick, then concludes that the police were justified—having drawn Hardrick into the net of their criminal investigation—in requiring him to show hands in order to secure their safety.

However, the facts demonstrate that the police threw their investigative net over Hardrick from the time of his arrival at the house. That the police were casting the investigative net as far as they could stretch it is clear from the facts the trial court relied on for suppression of the evidence against Hardrick. Having secured the premises and found no weapons present, the police, prior

to Hardrick's arrival, admitted two persons, one of whom they frisked, discovering drug paraphernalia. Shortly thereafter, Hardrick arrived at the residence with a companion. The trial court's findings of fact describe what happened next:

> Espino walked to the door and Defendant [Hardrick] followed him, intending to accompany him inside. When Espino knocked on the door, Detective Craig Tyer of the Task Force opened it and invited them in. Espino hesitated and Detective Tyler again invited them in, telling them there was a party going on inside. Espino entered and Defendant followed him.

Thus, instead of turning Hardrick away at the threshold, or soliciting his cooperation in avoiding intrusion upon their investigation, the police actually lured Hardrick and his reluctant companion across the threshold by an invitation to party. The police did this with no apparent purpose other than to search for drugs or drug paraphernalia, as they had searched a prior-arriving person.

The police did not request Hardrick's cooperation or voluntary consent for a search of his person before issuing the show hands order to Hardrick inside the house. Dressed in plain clothes and not identifying themselves as officers until after they invited Hardrick into the house, the officers' investigative purpose operated throughout this encounter, without reasonable suspicion that Hardrick was a participant in the crime they were investigating within the premises. The trial court made the following findings regarding what occurred after Hardrick crossed over into the house:

> After Espino and Defendant entered, Detectives Frank Kramer and Douglas Norcross identified themselves as law enforcement officers. Defendant already had one or both of his hands in his pants pockets. Detective Kramer ordered him to take his hands out of his pockets. Defendant partially complied at most but kept one of his hands in his pocket, clenched in a fist, and, according to Detective Kramer, turned partly away from him and toward another detective. Detective Kramer then grabbed Defendant's wrist above the hand still in his pocket. At this point, Defendant's

hand came out of his pocket with two baggies of methamphetamine in it, which were propelled down the adjacent hallway. Detective Kramer testified that Defendant removed his hand from his pocket himself; Defendant testified that Detective Kramer pulled it out. In either case, it is clear that Defendant did not remove his hand from his pocket voluntarily but because Detective Kramer had ordered him to do so.

In my view, the trial court correctly applied our precedent to these circumstances. Police-citizen encounters are of three different types: (1) arrests, (2) investigative stops or detentions, and (3) consensual interviews or encounters. *People v. Heilman*, 52 P.3d 224, 227 (Colo.2002); *People v. Jackson* 39 P.3d 1174, 1179 (Colo.2002). In *Heilman*, we held that an officer's command to "show your hands," directed at an occupant of a parked van effected a seizure because the circumstances did not create a reasonable suspicion of criminal activity. *Id.* at 228. Reasonable people would not feel free to disobey an order to "raise their hands to plain view" when directed at them by an armed police officer. *Id.* at 229.

The holding of *Heilman* is consistent with the generally applicable rule that police orders, instead of requests for cooperation, usually effectuate a seizure of the person to whom the order is directed. *See Jackson*, 39 P.3d at 1184 (identifying the demand/request distinction as an important factor in determining whether a police-citizen contact is a seizure); *People v. Melton*, 910 P.2d 672, 677 (Colo.1996) (no seizure where, *inter alia*, police "asked rather than demanded" defendant's name and address); Wayne R. LaFave, *Search and Seizure* § 9.3(a) at 100–08 (3d ed.1996) (distinguishing between requests and orders, and indicating that the latter effectuate a seizure).

In *Jackson*, the police stopped a car on reasonable suspicion that the driver committed a traffic infraction. 39 P.3d at 1177. We held that the police unconstitutionally seized a passenger in the car when the police temporarily confiscated the passenger's identification without reasonable suspicion. *Id.* at 1188–90. In so holding, we recognized that

even if the police have sufficient reasonable suspicion to search the driver of a car, separate reasonable suspicion is required to perform an investigative stop of the passenger. Thus, *Jackson* recognized that a person's mere presence at the scene of a crime or search is not of itself sufficient to justify a search or seizure of that person.

There are many circumstances where a person might inadvertently happen on a crime scene investigation in a public open space, private business, or at a person's home, as here. A person's arrival at such a scene is no indicator of criminal activity or *per se* justification for a weapons search of him or her. The Majority's discussion concedes this. *See* Maj. Op. at 269 (reasonable suspicion "that officer safety and the safety of others may be compromised" exists when a person "inserts himself into the situation" and the person refuses to show hands or makes a furtive gesture).

Likewise, a person's choice to turn away from the scene of a police investigation is not grounds for reasonable suspicion. In *Outlaw v. People,* 17 P.3d 150, 157 (Colo.2001), we said "when a police officer approaches an individual in a public place and seeks to ask him questions, the individual may ignore the officer and proceed on his way." *See also People v. Padgett,* 932 P.2d 810, 814 (Colo. 1997) ("An individual's attempt to avoid coming into contact with a police officer does not, without more, justify an investigative detention of the individual.").

Nor does reasonable suspicion exist solely because a person makes a "furtive gesture." *Heilman,* 52 P.3d at 229; *Outlaw,* 17 P.3d at 157. For example, Outlaw had his hand cupped and he was walking away from a circumstance that the police suspected to involve drug dealing, but they lacked reasonable suspicion for this hunch. The police wanted to see what Outlaw was cupping in his hand. We held that the police officers could not turn Outlaw from his course of walking away with his hand cupped, unless they had reasonable suspicion that he was committing a crime. *See Outlaw,* 17 P.3d at 159.

As in *Outlaw,* the police here did not have reasonable suspicion that Hardrick was engaging in criminal activity. The Majority's discussion concedes this point also. *See, e.g.,* Maj. Op. at 267 (relying on officer safety concerns, rather than reasonable suspicion of criminal activity, as the basis for this seizure). A furtive gesture is "too ambiguous, standing alone, to constitute the basis for an investigatory stop." *Heilman,* 52 P.3d at 229. While the police might have had a hunch that Hardrick was engaged in criminal activity, a mere hunch is insufficient to create reasonable suspicion. *E.g. Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *People v. Haley,* 41 P.3d 666, 674 (Colo.2001); *People v. H.J.,* 931 P.2d 1177, 1180 n. 5 (Colo.1997) ("Reasonable suspicion falls below probable cause, but above a mere inarticulate hunch.").

The Majority identifies three factors that it believes justified the search of Hardrick: the police found drugs in the residence shortly before Hardrick arrived there, the occupants of the house were uncooperative with the police, and Hardrick did not comply with the police officer's attempts to ensure that he was not a safety threat.

None of these factors create reasonable suspicion. Hardrick's arrival at a house where others had drugs therein does not create reasonable suspicion. As we held in *People v. Carillo–Montes,* 796 P.2d 970 (Colo. 1990), "[t]he fact that a person keeps cocaine at a residence is simply insufficient to raise a reasonable suspicion that everyone who approaches that residence ... [is] in some way involved in a transaction related to the cocaine." *Id.* at 974.

The fact that occupants of the house were uncooperative with police also fails to create reasonable suspicion that Hardrick was engaged in criminal activity or that he posed a risk to officer safety. There is simply no inferential link between Hardrick's behavior and the behavior of others before Hardrick arrived. Moreover, by the time that Hardrick arrived, the situation in the house was under officer control. In the words of the trial court's suppression order: "Once Defendant and Espino arrived ... the situation was under the control of law enforcement, so much so that one officer left to seek a search warrant." What is more, the trial court

found that the situation in the house was not apparently dangerous. The police did not find any weapons. The police had already arrested one particularly uncooperative occupant of the house and taken him to jail. A number of police were conducting the investigation and had secured the premises.

The trial court found and concluded that Hardrick's encounter with the police became a seizure of Hardrick when one of the officers "ordered him to remove his hand from his pocket and then grabbed his wrist when he did not comply." The thread on which the Majority hangs its judgment to justify this seizure is police safety. This thread is too thin to support the net of criminal investigation the police threw over Hardrick. Particularly telling is the fact that the police admitted four people into the house without identifying themselves as officers or seeking the voluntary assistance of these citizens in avoiding intrusion into the scene of the investigation. Adding persons to the crime scene increases rather than decreases the burden of officers to secure the scene; the police added four persons to the circle of those in the house for the apparent purpose of investigating them.

The police safety cases on which the Majority relies differ significantly from this case. *People v. Smith*, 13 P.3d 300 (Colo. 2000) involved a traffic stop of a stolen car at 2:50 a.m. *Id.* at 303. During the stop, the police observed the occupant of the stopped car making a cell phone call. *Id.* Shortly thereafter, a Suburban inexplicably pulled up behind the police car and left its headlights on, preventing the police from seeing into the car. *Id.* We held that the police had authority to contact and restrain the driver of the Suburban in order to protect their safety. *Id.* at 305.

In *People v. Garcia*, 11 P.3d 449 (Colo. 2000), we justified the handcuffing of Garcia and his detention in the patrol car on the circumstances of a domestic disturbance at night when the police responded to a report of men and women yelling and screaming at the residence. *Id.* at 454. The police did not know how many people were involved or if they were armed. *Id.* Garcia answered the door and stepped outside to talk with the officers. *Id.* at 451. As the police spoke with Garcia, they noticed a drug pipe at his feet. *Id.* They then detained him in the patrol car while they continued their investigation. *Id.*

Here the trial court found that Hardrick had his hand in his pocket before the plainclothes officers identified themselves as police officers: "Indeed, the evidence indicates that Defendant did not put his hands in his pockets only after he entered the residence and recognized the presence of law enforcement but beforehand." The trial court then distinguished this circumstance from others in which a person makes a potentially threatening gesture in reaction to the police, thereby triggering a protective police response.

Hardrick had his hand in his pocket while he crossed into the house, thinking he was going to a party. He had no apparent reason to be reaching for a weapon or for putting his hand in his pocket to conceal anything. We defer to the trial court's findings of fact, if the evidence supports them. *See People v. D.F.*, 933 P.2d 9, 14 (Colo.1997). Under these circumstances, the officers had no reason to believe that Hardrick constituted a threat to them.

In *Smith*, we underscored the importance of the circumstances in determining whether a reasonable police officer would have recognized "the potential danger in the situation and conducted a protective search in order to secure his safety." 13 P.3d at 307. The police here lacked the circumstances showing "a reasonable nexus" based on articulable facts for the intrusion upon Hardrick. *Garcia*, 11 P.3d at 454; *see also Smith*, 13 P.3d at 305.

In my view the Majority misplaces reliance on *People v. Martinez*, 801 P.2d 542 (Colo. 1990). There, the police found drugs and a substantial number of weapons in the house. *Id.* at 543. There was reasonable concern for officer safety. Our cases, such as *Smith*, 13 P.3d 300, and *Garcia*, 11 P.3d 449, demonstrate that invocation of the officer safety rationale for restraint of a citizen requires more justification than existed in this case.

In sum, the trial court found that there were no dangerous circumstances present

when the police searched Hardrick. The police were in control of the situation, and could have avoided contact with Hardrick by turning him away from the door. Instead, the police lured Hardrick and his companion into the residence by telling them that there was "a party going on inside." The facts show that the police wanted Hardrick in the house as part of their drug investigation, so they took charge of the situation to effectuate this purpose. They seized Hardrick without reasonable suspicion. The trial court correctly suppressed the drug evidence that the police discovered as a result of their conduct.

Accordingly, I would uphold the suppression order and respectfully dissent.