**Marvin A. OUTLAW, Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

No. 99SC662.

Supreme Court of Colorado, En Banc.

Jan. 22, 2001.

As Modified on Denial of Rehearing Feb. 5, 2001.

David S. Kaplan, Colorado State Public Defender, Elizabeth Griffin, Deputy State Public Defender, Denver, CO, Attorneys for Petitioner.

Ken Salazar, Attorney General, Peter J. Cannici, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, CO, Attorneys for Respondent.

Justice HOBBS delivered the Opinion of the Court.

In this Fourth Amendment seizure case, we granted certiorari to review the court of appeals' decision in *People v. Outlaw*, 998 P.2d 20 (Colo.App.1999).[1] The trial court denied Marvin Outlaw's motion to suppress evidence, and a jury convicted him of one count of possession of a schedule II controlled substance (cocaine), a class four felony, *see* § 18–18–405(2)(a)(I), 6 C.R.S. (2000), and several habitual criminal counts, *see* § 16–13–101(2), 6 C.R.S. (2000). The court of appeals determined that Outlaw had failed to meet his burden of showing by a preponderance of the evidence that the police "seized" him within the meaning of the Fourth Amendment. We hold that, while a defendant has the initial burden of going forward with evidence to support his suppression motion, Outlaw met that burden. Under the undisputed facts of this case, the police unconstitutionally seized Outlaw, and the trial court should have granted his suppression motion.

## I.

On the evening of April 30, 1997, two Denver Police officers (the officers) were patrolling Denver's Five Points neighborhood. The officers were driving a marked patrol car and were wearing Denver Police uniforms.

At approximately 6:20 p.m., the officer driving the patrol car stopped at a red light on northbound Welton Street at the Five Points intersection.[2] It was still daylight. While stopped, the officers in the patrol car observed four individuals—two men and two women—standing outside the 715 Club, a bar on 26th Avenue. The officers did not recognize any of the individuals, nor did they know how long the group had been standing outside the bar. They did not see the individuals exchange anything. The officers were approximately thirty-five to forty-five yards away from the individuals when they saw them.

The individuals noticed the patrol car and began walking east on 26th Avenue. The officers turned the patrol car east onto 26th Avenue to follow them. Crossing the westbound lane of 26th Avenue, the officer operating the patrol car drove it onto the sidewalk behind the four individuals. They continued to 'walk, with the patrol car following directly behind them.

The patrol car slowly followed five feet behind the group for a distance of twenty or thirty feet. Outlaw was closest to the patrol car. The officer driving the patrol car noticed that Outlaw's right hand was open but his left hand was closed in a fist. This officer concluded that Outlaw was holding something in his left hand. He navigated the patrol car back onto the street, into the westbound lane of traffic. He drove slowly eastbound in this lane, following alongside Outlaw for another ten to fifteen feet as Outlaw walked down the sidewalk. The officer then stopped the car and summoned Out-

---

1. We granted certiorari on the following issue: Whether the court of appeals erred in stating that the defendant "ha[s] the burden of proving by a preponderance of the evidence whether and when a 'seizure' [of his person] occurred."

2. This intersection marks the convergence of Welton Street, Washington Street, 27th Street, and East 26th Avenue in central Denver.

law, by saying either "Can you come over to the vehicle" or "Come over to the vehicle." [3] He used a conversational tone of voice. Outlaw complied. He turned and walked to the patrol car.

As Outlaw approached the car on the driver's side, his left hand remained closed. The officer saw what appeared to be a small piece of clear plastic protruding from that hand.[4] Outlaw then made a sweeping motion with his closed hand, dropping it out of view for a moment. This hand was open and empty when it came back into the officer's view.

The police exited and secured Outlaw near the rear of the patrol car. They recovered two baggies of what they suspected to be crack cocaine on the ground near the patrol car. The district attorney charged Outlaw with one count of possession of a schedule II controlled substance (cocaine). See § 18–18–405(2)(a)(I).

Outlaw filed a motion to suppress all evidence in the case as the product of an illegal seizure of his person. He argued that the encounter was a non-consensual, investigatory stop conducted without reasonable suspicion. Because his stop violated the Fourth Amendment, Outlaw asserted that the trial court should have suppressed all evidence stemming from it.

The trial court ruled that the encounter was consensual; hence, not in violation of the Fourth Amendment. It alternatively ruled that the police had reasonable suspicion for the stop. Under habitual offender sentencing, Outlaw received twenty-four years in the Colorado Department of Corrections upon conviction.

The court of appeals affirmed. See Outlaw, 998 P.2d at 22. It concluded that Out-

law had the burden of proving by a preponderance of the evidence that a "seizure" had occurred. See id. at 24. Calling the issue "extremely close," the court of appeals concluded that the encounter was consensual, and upheld Outlaw's conviction. Id.[5]

## II.

■ The United States and Colorado Constitutions protect against unreasonable searches and seizures. See U.S. Const. amends. IV, XIV; Colo. Const. art. II, § 7; People v. Garcia, 11 P.3d 449, 453 (Colo. 2000). However, they apply only when police contact "impermissibly intrudes upon an individual's personal security or privacy." People v. Melton, 910 P.2d 672, 676 (Colo.1996); see also People v. Paynter, 955 P.2d 68, 71 (Colo.1998). As the United States Supreme Court explained in Terry v. Ohio, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968), "[O]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."

■ Police-citizen encounters are of three different types: (1) arrests; (2) investigatory stops; and (3) consensual encounters. See, e.g., People v. Cervantes-Arredondo, 17 P.3d 141, 146 (Colo.2001); People v. Cascio, 932 P.2d 1381, 1385 (Colo.1997); People v. Padgett, 932 P.2d 810, 813 (Colo.1997). Each of these categories requires "varying levels of justification and protection." Cascio, 932 P.2d at 1385. While arrests and investigatory stops are seizures implicating the protections of the Fourth Amendment and Article II, section 7, consensual encounters are not. See id.

---

3. The officer could not state with certainty whether his statement to Outlaw took the form of a question or a command.

4. The officer offered conflicting testimony concerning exactly what he saw in Outlaw's closed hand. At the preliminary hearing, he gave no testimony about seeing plastic in Outlaw's hand. At the Motions hearing, he stated that the clear plastic protruded from between Outlaw's thumb and index finger. At trial, he stated that the clear plastic protruded from near Outlaw's pinky finger.

5. Both parties fully briefed the issue of whether the contact between Outlaw and the officers was a consensual encounter, as well as the issue of whether the contact was a valid investigatory stop supported by reasonable suspicion. We therefore address these closely intertwined issues. Where the evidence in the record is uncontroverted, we apply the correct legal test in deciding the case. See, e.g., People v. Newton, 966 P.2d 563, 570 n. 8 (Colo.1998); Romer v. Colorado Gen. Assembly, 810 P.2d 215, 225 (Colo.1991).

We first review the allocation of the burden of going forward and the burden of proof in suppression hearings. We then discuss the characteristics of consensual encounters and investigatory stops. Based upon the facts known to the police at the time of Outlaw's detention, we conclude that an impermissible seizure occurred in violation of the Fourth Amendment.

## A.

### Burden of Going Forward and Burden of Proof

■ At a suppression hearing, as the moving party, the defendant has the burden of going forward with evidence of an impermissible seizure. *See People v. Jansen*, 713 P.2d 907, 911 (Colo.1986); *see also United States v. de la Fuente*, 548 F.2d 528, 534 (5th Cir. 1977) ("[T]he defendant must first discharge his initial burden of producing some evidence on specific factual allegations sufficient to make a prima facie showing of illegality."). This burden requires the defendant to make two different showings: (1) the point at which he was "seized" within the meaning of the Fourth Amendment; and (2) that the seizure was unconstitutional. *See United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir.1994).

■ When the defendant comes forward with evidence of a seizure, the fact that police proceeded without a warrant places the burden on the prosecution to demonstrate the encounter's legality. *See People v. P.E.A.*, 754 P.2d 382, 385 (Colo.1988) (holding that a warrantless seizure is presumptively illegal).

■ Accordingly, if Outlaw showed sufficient facts, the burden of going forward shifted to the prosecution. *See Jansen*, 713 P.2d at 911. The burden of proof always remains with the prosecution "to establish that warrantless conduct on the part of the officers falls within one of the narrowly defined exceptions to the warrant requirement." *Id.; see also People v. Canton*, 951 P.2d 907, 909 n. 3 (Colo.1998) ("When police detain a person without a warrant, the burden of proof is on the prosecution to prove the constitutional validity of the stop and any subsequent search."); *Carhee*, 27 F.3d at 1496.

■ The police had no warrant here. We therefore focus our inquiry first on whether Outlaw put forth sufficient evidence of an illegal seizure. We defer to a trial court's findings of historical fact and will not disturb them if supported by competent evidence in the record. *People v. D.F.*, 933 P.2d 9, 14 (Colo.1997). However, we will correct a lower court's use of an erroneous legal standard or a conclusion of law that the uncontroverted evidence contradicts. *Id.*

## B.

### Consensual Encounter

■ In a consensual encounter, the individual voluntarily cooperates with the police and is free to leave at any time. *See Cervantes–Arredondo*, at 17 P.3d at 147–148; *Cascio*, 932 P.2d at 1385. The test is whether a reasonable person under the circumstances would believe that he or she was free to leave or disregard the officer's request for information. *See People v. Thomas*, 839 P.2d 1174, 1177–78 (Colo.1992). This test is objective in nature, based on the factual circumstances surrounding the encounter. *See Paynter*, 955 P.2d at 72. Inherent social pressure to cooperate with the police is not itself a sufficient basis for declaring the encounter non-consensual. *See People v. Johnson*, 865 P.2d 836, 842 (Colo.1994).

■ Because the touchstone of the Fourth Amendment is reasonableness measured in objective terms, a court must consider the totality of the circumstances in determining whether the police exercised force or authority to effectuate the stop, or whether the police merely sought the voluntary cooperation of a citizen through a consensual encounter. *See Paynter*, 955 P.2d at 72–73. "[A]ny assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account 'all of the circumstances surrounding the incident' in each individual case." *Michigan v. Chesternut*, 486 U.S. 567, 572, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565, 571 (1988) (citations omitted). This test is "necessarily imprecise." *Id.* at 573, 108 S.Ct. at 1979.

A totality of the circumstances analysis requires an examination of the behavior of the parties, as well as the physical, temporal, and social context of the encounter. "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Cascio,* 932 P.2d at 1386. Representative examples of when a seizure occurs include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980).

Even in the absence of physical force, we have determined that a seizure occurred where officers required a defendant to alter his direction of travel, walk back to where the officers were, and remain while police investigated him. *See Paynter,* 955 P.2d at 74; *Padgett,* 932 P.2d at 812–14.

Outlaw met his initial burden of showing a seizure. The record here does not support the existence of a consensual encounter. According to the uncontested evidence, the police drove the patrol car onto the sidewalk and followed only five feet behind Outlaw and the other individuals for a distance of twenty to thirty feet. The police then pulled the car off of the sidewalk, into the wrong lane of traffic, and alongside Outlaw for another ten to fifteen feet. In all, the officers followed Outlaw at extremely close range for a distance of thirty to forty-five feet; during the entire period, the patrol car was not in a usual lane of traffic.

The officers' close pursuit of a pedestrian while in an automobile on a sidewalk is a "show of authority." *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. A reasonable person in Outlaw's position would not feel free to proceed on; rather, he would view the police conduct as a command to stop. Police testimony demonstrated that the police summoned Outlaw to the patrol car. Only then did he turn toward the car and approach. Under the circumstances, Outlaw was not free to proceed on his way. *See Padgett,* 932 P.2d at 812. The police made a show of force by their conduct with the car that altered Outlaw's direction of travel and procured a stop.

The trial court failed to evaluate the totality of the circumstances; consequently, it did not apply the correct standard. *See D.F.,* 933 P.2d at 16. This was not a consensual encounter. Outlaw came forth with facts to show that he was "seized" at the moment police summoned him to the patrol car. The stop also took place without a warrant. The burden thus shifted to the prosecution to demonstrate a legal stop. We now discuss whether this record demonstrates a valid investigatory stop.

## C.

### Investigatory Stop

An investigatory stop is an intermediate level of police response, or limited seizure, made on facts justifying reasonable suspicion of a person having committed a crime. *Garcia,* 11 P.3d at 453; *People v. Archuleta,* 980 P.2d 509, 513 (Colo.1999). Because an investigatory stop implicates a seizure based on less than probable cause, it must be brief in duration, limited in scope, and narrow in purpose. *See People v. Tottenhoff,* 691 P.2d 340, 343 (Colo.1984). To effect a legal investigatory stop, the police "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

A police officer, having less than probable cause to arrest, may temporarily detain an individual for investigatory purposes if all of the following criteria exist: (1) there is reasonable suspicion that the individual has committed, or is about to commit, a crime; (2) the purpose of the detention is reasonable; and (3) the character of the detention is reasonable when considered in light of the purpose. *See Garcia,* 11 P.3d at 454; *D.F.,* 933 P.2d at 12; § 16–3–103, 6 C.R.S. (2000) (codifying this test).

A trial court must take into account the totality of the circumstances known to police officers at the time of the intrusion, combined with any rational inferences therefrom. *Garcia,* 11 P.3d at 453; *Padgett,* 932 P.2d at 815. We defer to the trial court's findings of fact, but review its conclusions of law de novo. *See Garcia,* 11 P.3d at 453. Like the trial court, we examine the totality of the circumstances known to the police officers at the time of the encounter. *Id.*

At the suppression hearing, the trial court ruled that if Outlaw's contact with the police constituted an investigatory stop, the police acted with reasonable suspicion. The trial court based its conclusion on the following facts and circumstances known to the officers at the time of the stop and presented through testimony at the suppression hearing: (1) the police had made drug arrests in the area in the past, and considered it to be a high crime area; (2) the police observed four people standing close together on the sidewalk; (3) these four people began walking away, apparently after seeing the patrol car; (4) Outlaw had his left hand closed in a fist; and (5) as Outlaw approached the patrol car, the officer driving the patrol car saw a piece of clear plastic protruding from Outlaw's closed hand.

Taking these facts as true, we hold that the trial court erred as a matter of law in finding that the police had an articulable and specific basis to believe that Outlaw was committing, had committed, or was about to commit a crime.

We have rejected the proposition that a history of past criminal activity in an area is itself sufficient to create a reasonable suspicion that a crime is being, has been, or will be committed. *See People v. Greer,* 860 P.2d 528, 531 (Colo.1993); *People v. Rahming,* 795 P.2d 1338, 1343 (Colo.1990). The fact that Outlaw and his companions were standing in a neighborhood frequented by crime is not in itself a basis for concluding that Outlaw was engaged in criminal conduct. *See United States v. Davis,* 94 F.3d 1465, 1468 (10th Cir.1996).

Nor is a gathering of individuals on a public sidewalk sufficient to justify an investigatory stop. Peaceable gatherings are a hallmark of our democracy, explicitly protected in both the United States and Colorado Bill of Rights. *See U.S. Const. amend. I* (guaranteeing "the right of the people to peaceably assemble"); Colo. Const. art II, § 24. Furthermore, when a police officer approaches an individual in a public place and seeks to ask him questions, the individual may ignore the officer and proceed on his way. *See Davis,* 94 F.3d at 1468. Accordingly, the fact that Outlaw and his companions began walking away from the patrol car after one of them apparently noticed the car fails to provide reasonable suspicion.

Nor was Outlaw's closed hand enough to support reasonable suspicion. An individual might tighten his or her hand into a fist for a number of reasons, including fear or anger at being followed by police at extremely close range. We have previously held that a so-called "furtive gesture," standing alone, is too ambiguous to constitute the basis for an investigatory stop. *People v. Thomas,* 660 P.2d 1272, 1275 (Colo.1983). We further noted that:

> From the viewpoint of the observing police officer, an innocent move may often be mistaken for a guilty reaction. From the perspective of the person observed, the "furtive gesture" might be impelled by a variety of motives, from an unsettling feeling of being watched to an avoidance of what might be perceived as a form of harassment. Then again, a person's movement may not be a reaction to the police at all.

*Id.* (citations omitted). Finally, since we have already determined that Outlaw was "seized" at the moment the officers summoned him to the patrol car, and since the officers did not see anything in Outlaw's hand until after the seizure had taken place, the sight of plastic in Outlaw's fist cannot have any part in forming a reasonable, articulable basis for his stop.

Even though each of these facts, in and of itself, is insufficient to give rise to reasonable suspicion, the prosecution argues that, taken together, they established reasonable suspicion that Outlaw was committing a crime. We disagree.

We compare the composite facts the trial court relied on here to those in *Greer*. In that case, a Colorado Springs police officer observed an area directly outside a bar known as a site for narcotic sales. 860 P.2d at 529. The defendant exited her car outside the bar and three men approached her. The defendant apparently had a conversation with the men, although the officer was standing too far away to discern what the conversation involved. The officer could not see the defendant's face, which was obscured by the back of one of the men with whom she was conversing. As the men turned to leave, the officer saw one of the men put a single bill of unknown denomination in his pocket. The officer did not see any exchange take place and did not see if the defendant had given money to the man. Nevertheless, the officer concluded that a narcotics deal had taken place. The officer contacted other members of the police force, who stopped the defendant, searched her, and found cocaine. *See id.* at 530.

These facts, taken together, were insufficient to create reasonable suspicion to believe that the defendant was involved in a drug transaction. *See id.* We characterized this evidence as an "unarticulated hunch that a criminal act has occurred" that is "not sufficient to support an investigatory stop." *Id.* at 530–31.

The facts here provide even less support for a valid investigatory stop. As in *Greer*, the police officers here were patrolling a neighborhood known for drug transactions in an effort to combat the drug trade. Likewise, they observed individuals huddled together in front of a bar, known as a site for drug transactions. In both cases, the officers could not ascertain the nature of the conversation they were observing, nor did they actually see any sort of transaction take place. In contrast to this case, however, the police in *Greer* observed the group for a period of time and witnessed one member of the group pocket some money; here, when the police decided to follow behind Outlaw and his companions, no exchange or other suspicious activity had occurred. Reasonable suspicion was lacking in *Greer* on relatively stronger facts; it follows that no reasonable suspicion existed here to detain Outlaw through a show of police force.

*Davis*, 94 F.3d 1467, also contained facts that, while more likely to provide a reasonably articulable basis for a detention than the facts of this case, were nonetheless insufficient to justify an investigatory stop. In *Davis*, officers were patrolling an area with a history of criminal activity in a marked patrol car. At approximately 10:00 p.m., the officers observed a car with four individuals inside it parked in front of a building known to be associated with criminal activity. As the officers arrived, one of the individuals in the car exited the vehicle, made eye contact with one of the officers, then broke eye contact and began walking toward the building with his hands in his pockets. The officers recognized the individual as a gang member, ex-convict, and seller of narcotics. The officers told the individual to stop and take his hands out of his pockets. When he continued walking, the officers seized him. The Tenth Circuit Court of Appeals found that the officers' conduct was not based upon "a reasonable suspicion that criminal activity was afoot." *Id.* at 1468.

As in this case, the individuals in *Davis* were congregating in an area that was known to have a history of criminal activity. As here, the officers' primary suspicion was based on their inability to fully view the defendant's hand. Unlike here, the officers in *Davis* additionally knew the defendant as a gang member and drug dealer. The defendant looked directly at the officers before walking away. The contact between the officers and the defendant occurred in the dark of night rather than the daytime. While each of these differences was not sufficient in itself to create reasonable suspicion, *see id.* at 1468 (eye contact with officers); *id.* at 1469 (knowledge of prior criminal record), together they might have led the court to a conclusion that officers had reasonable suspicion. Nonetheless, the court found that reasonable suspicion did not exist. *Id.* at 1468. It follows, based on the facts known to the officers in this case, which are weaker than those in *Davis*, that there was no reasonable, articulable suspicion of a crime here.

Finally, we contrast our decision in *Archuleta*, 980 P.2d 509. In that case, a police officer noticed three men huddled together in a dark alley in an area known for drug activity. Acting on a general suspicion that the individuals might be engaged in a drug transaction, the officer parked his car and approached the men on foot. Upon seeing the officer, one of the men immediately took off running, knocking over a bicyclist. The officer pursued, encountered the man hiding under a table in a deserted portion of a bar, and effectuated an investigatory stop based on reasonable suspicion when the man, in answer to the officer's question about why he had run, stated that he had outstanding warrants for his arrest. Our decision in *Archuleta* incorporated the defendant's flight and evasion as important factors in evaluating the totality of the circumstances surrounding the stop. We held that continued evasive action that escalates beyond a chase can form one element of a basis for reasonable suspicion. *See id.* at 515; *see also Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570, 579–80 (2000).

Here, Outlaw neither ran upon seeing the officers nor sought to evade them. He did not attempt to hide from the officers. Instead, he maintained a steady walking pace as the patrol car followed him from behind. A hallmark of a consensual encounter is that a citizen is free to ignore police attempts to inquire about the citizen's activity. Surely, then, a citizen should be able to proceed on his way at a normal pace despite the choice of officers, who lack reasonable suspicion of a crime, to follow him in a patrol car. Outlaw's conduct in ignoring the officers and continuing to walk away failed to contribute to a valid basis for reasonable suspicion.

Taken in their totality, the uncontroverted facts here demonstrate that Outlaw's encounter with the police was not consensual. It was an investigatory stop not based on reasonable suspicion. We therefore hold that Outlaw suffered an unconstitutional seizure. The trial court should have suppressed evidence deriving from the seizure.

### III.

Accordingly, we reverse the judgment of the court of appeals. We return this case to the court of appeals with instructions to remand it to the trial court for further proceedings consistent with this opinion.

Justice COATS does not participate.