23CA1494 Peo in Interest of DM 04-03-2025

COLORADO COURT OF APPEALS

_____

Court of Appeals No. 23CA1494
Larimer County District Court No. 23JD57
Honorable Daniel M. McDonald, Judge

_____

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of D.M.,

Juvenile-Appellant.

_____

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Gomez and Lum, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 3, 2025

_____

Philip J. Weiser, Attorney General, Jessica E. Ross, Senior Assistant Attorney General & Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee

Madison R. Whitley, Alternate Defense Counsel, Denver, Colorado, for Defendant-Appellant

¶ 1     Juvenile defendant D.M. appeals the district court's judgment adjudicating him for unlawful possession of financial devices, unlawful possession of an identification document (I.D.), carrying concealed weapons, and possession of a defaced handgun by a juvenile. We affirm the adjudication.

## I.     Background

¶ 2     On March 21, 2023, around 8:30 a.m., Fort Collins police officers responded to a 911 call for an in-progress home burglary. The caller reported that his son, D.M., was trying to break into the home. Police were already pursuing a warrant for D.M.'s arrest because the father had called 911 the night before and reported that D.M. had assaulted him, but the warrant had not been approved yet.

¶ 3     Scott Brittingham, the first officer on the scene, testified that when he arrived he saw someone on a bicycle outside the home. Brittingham told the individual to stop, but the individual began to pedal away and Brittingham pushed the individual off the bike. The individual confirmed he was D.M. when he was on the ground.

¶ 4     When additional officers arrived they helped search D.M., testifying that they discovered an eighteen-inch-long knife, described as a "machete," a loaded handgun with the serial number filed off, several credit and debit cards belonging to other people, and someone else's driver's license.  Police also discovered "suboxone" strips.

¶ 5     D.M., who was seventeen at the time of his arrest but turned eighteen soon after, faced eight delinquency counts for (1) assault in the second degree with a deadly weapon[1] for the assault the night before; (2) criminal possession of financial devices for the credit and debit cards; (3) carrying a concealed weapon for the gun; (4) carrying a concealed weapon for the knife; (5) possession of a defaced firearm; (6) possession of a handgun by a juvenile; (7) criminal possession of an I.D. for the driver's license; and (8) unlawful possession of a controlled substance for the suboxone strips.

---

[1] The father told police he was hit in the head with a blunt "dark metal object" that was "similar to a blackjack," but this object was never recovered.

¶ 6 After a bench trial, the court found that the prosecution met its burden to prove counts 2 through 7, and adjudicated D.M.[2] The court sentenced D.M. to serve 165 days in jail, to be served concurrently with his sentences in two other cases, with 135 days of confinement credit.

¶ 7 This appeal followed, with D.M. challenging whether the court erred by (1) concluding Brittingham had reasonable suspicion to conduct an investigatory stop and seize D.M.; (2) converting the jury trial into a bench trial; and (3) adjudicating D.M. for a class five felony using expired financial devices and a difficult-to-read card. We affirm the district court.

## II. Analysis

### A. Reasonable Suspicion

¶ 8 First, D.M. argues that Brittingham lacked reasonable suspicion to justify an investigatory stop when he knocked D.M. off his bike and seized him, and that the district court erred by denying his motion to suppress the evidence gathered from the stop. D.M. argues that Brittingham had no reason to believe that D.M. was the

---

[2] As discussed in greater detail below in Part B, counts 1 and 8 were dismissed before trial.

suspect from the burglary report because he could not see D.M.'s tattoos and shaved head as he was wearing a hoodie. Brittingham could only say that the person he encountered matched D.M.'s "physical frame" and height without other identifying details before D.M. pedaled away.

¶ 9 The People argue that D.M. abandoned this issue because he did not contest whether the prosecution presented sufficient evidence to support the investigatory stop at the suppression hearing. The People note that, instead, the defense focused on suppressing statements D.M. made to police — even after the court asked if there was "anything else" to address. Alternatively, the People argue that D.M. forfeited the issue and plain error review would apply. Finally, the People argue that the court did not err regardless because Brittingham had sufficient evidence to establish reasonable suspicion to stop D.M.

## 1.    Additional Background

¶ 10    Ahead of trial D.M. moved to suppress the evidence gathered from the stop and statements he made to police.[3]  At the suppression hearing, Brittingham testified that he had been given D.M.'s name and knew of the previous night's assault when he responded to the burglary call, but he was not involved in the assault investigation.  Brittingham testified he heard that D.M. was "about five six" and "white with a shaved head and tattoos on his arms."

¶ 11    Brittingham arrived at the home and saw an individual outside the home on a bike.  Brittingham told the individual to stop before pushing him off the bike.  Brittingham asked if the individual was "D." and he said "yes," before Brittingham placed D.M. in handcuffs without resistance.  Brittingham agreed that D.M., once in handcuffs, was not free to leave.

---

[3] The district court agreed to suppress statements D.M. made to police after he was arrested and placed in a patrol car because D.M. was a juvenile and the questioning occurred without a parent or guardian, in violation of section 19-2.5-203(1), C.R.S. 2024.  This is not relevant to the issue on appeal, so we have largely omitted this portion of the suppression hearing in this opinion.

¶ 12    The officers searched D.M. and found a knife on D.M.'s chest and a gun in his pocket. They also emptied his pockets, discovering the suboxone strips, credit and debit cards, and an I.D. Brittingham testified that the searches were for safety purposes and are standard procedure during an arrest. Brittingham also confirmed the warrant for D.M.'s arrest for the assault or the burglary had not been issued when he seized D.M.

¶ 13    The prosecution argued that Brittingham had reasonable suspicion to seize D.M. because Brittingham understood that D.M. had assaulted his father the night before at the same house as the reported burglary, arrived at the home within minutes, and saw an individual that roughly matched D.M.'s description leaving the home by bicycle. D.M. then confirmed his name, giving Brittingham probable cause to arrest him and conduct a search incident to arrest for safety purposes without a warrant. The defense argued that D.M.'s statements could not come in, even for impeachment, but did not challenge reasonable suspicion for the initial stop or the evidence police discovered in the search.

¶ 14    The court found that when Brittingham placed D.M. in handcuffs D.M. was in custody and Brittingham had probable cause to arrest D.M. for the alleged assault from the night before. The court also found that D.M.'s search was incident to his arrest and denied the motion to suppress the evidence (the gun, knife, credit and debit cards, and I.D.) found during the search. Further, the court found that asking D.M.'s name fell under *Miranda*'s "booking" exception, and inquiring about weapons was for officer safety. The court ended by asking if there was "anything else" and the parties did not raise any further issues.

### 2.    Waiver, Forfeiture, and Abandonment

¶ 15    Waiver is the "intentional relinquishment of a known right or privilege," but "[w]e 'do not presume acquiescence in the loss of fundamental constitutional rights, and therefore indulge every reasonable presumption against waiver.'" *People v. Rediger*, 2018 CO 32, ¶ 39 (citation omitted). Waiver requires "an intentional relinquishment of a known right or privilege" because "a waiver extinguishes error, and therefore appellate review." *Id.* at ¶ 40.

¶ 16    "Abandonment, in contrast, typically arises from a party's decision not to pursue or reassert a claim that the party had raised previously" and will also extinguish appellate review. *People v. Smith*, 2024 CO 3, ¶ 18; *see also, e.g., People v. Ortega*, 266 P.3d 424, 428 (Colo. App. 2011) ("We also deem abandoned any additional contentions which Ortega raised in his postconviction motion and which have not been pursued on appeal."); *People v. Delgado*, 2019 COA 55, ¶ 9 n.3 ("We deem abandoned, and won't address, the seven claims that defendant raised in his Rule 35(c) motion but didn't discuss on appeal.").

¶ 17    Forfeiture, in turn, is "the failure to make the timely assertion of a right" but this does not extinguish appellate review — forfeited errors may be reviewed "under the plain error standard." *Rediger*, ¶ 40 (citation omitted). "[W]hile a waiver requires intent, forfeiture generally comes about through neglect." *People v. Garcia*, 2024 CO 41M, ¶ 28. "We review de novo whether a claim is waived or forfeited." *Id.* at ¶ 29.

¶ 18    The People argue that the defense abandoned any challenge relating to whether Brittingham had reasonable suspicion to

conduct the initial stop. While the defense did not argue this point at the hearing, we decline to find that this amounts to an intentional decision to relinquish a right or to not pursue a previously raised claim. But we do conclude that D.M. forfeited this challenge. *See Rediger*, ¶ 40.

¶ 19    D.M.'s written motion contesting his seizure and search (1) recited relevant Fourth Amendment law without applying it to his case, and (2) requested a suppression hearing without developing a specific argument. *See Phillips v. People*, 2019 CO 72, ¶¶ 12-13 (requiring motions to suppress to "'state with reasonable specificity the legal grounds upon which [they] are based' in order 'to put the prosecution on notice of the contentions it must be prepared to meet at a suppression hearing and to inform the court of the issues to be decided.'") (citation omitted) (alteration in original). In the suppression hearing D.M.'s counsel focused on the statements D.M. made and not the evidence seized during the stop, and did not contest whether Brittingham had reasonable suspicion for the stop. The failure to specifically contest reasonable suspicion during the hearing shows that while D.M. may not have intentionally waived or

abandoned this challenge, it was forfeited and is therefore subject to plain error review. *See Rediger*, ¶ 40; *see also Phillips*, ¶¶ 15, 18, 22.

### 3.  Standard of Review and Applicable law

¶ 20    "Plain error is obvious and substantial," and we will only reverse the district court "if the error 'so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction.'" *Hagos v. People*, 2012 CO 63, ¶ 14 (citations omitted). "In reviewing a trial court's ruling on a motion to suppress, we look solely to the record created at the suppression hearing." *People v. Thompson*, 2021 CO 15, ¶ 16.

¶ 21    "Arrests and investigatory stops are seizures that implicate Fourth Amendment protections." *People v. Dacus*, 2024 CO 51, ¶ 26. While "[b]oth the U.S. and Colorado Constitutions require that searches and seizures by the government be supported by probable cause[,]" police officers in some circumstances may conduct investigatory stops "without offending the individual's constitutional protections against unreasonable seizures." *People v.*

10

*Brown*, 2019 CO 63, ¶ 10.  To conduct an investigatory stop police officers must have "reasonable suspicion of criminal activity" — this requirement is at issue in this appeal.  *Id.* (citation omitted).

¶ 22　　To meet this burden, police "must have 'a specific and articulable basis in fact for suspecting that criminal activity has occurred, is taking place, or is about to take place.'"  *Id.* (citation omitted).  When reviewing the constitutionality of an investigatory stop, courts must "look to the totality of circumstances, keeping in mind that '[a]n officer is entitled to draw reasonable inferences from all the circumstantial evidence "even though such evidence might also support other inferences."'"  *Id.* at ¶ 11 (citation omitted) (alteration in original).

### 4.　　Application

¶ 23　　In pushing D.M. off the bike, Brittingham seized him because it became clear D.M. could not leave and his liberty was restrained.  *See Outlaw v. People,* 17 P.3d 150, 156 (Colo. 2001) ("Representative examples of when a seizure occurs include '. . . some physical touching of the person of the citizen.'") (quoting *United States v. Mendenhall,* 446 U.S. 544, 554 (1980)).  Whether

11

Brittingham had reasonable suspicion depends on what he knew then.

¶ 24     On his arrival, Brittingham knew that (1) a burglary allegedly was, or had recently been, in progress; (2) the caller identified the burglary suspect as D.M.; (3) D.M. had allegedly committed an assault the night before at the same home; (4) D.M. was described as "about five six . . . white with a shaved head and tattoos on his arms"; (5) when he arrived at the address — just minutes after dispatch — he saw an individual outside the home on a bicycle; (6) the individual had "roughly [the suspect's] frame" but was otherwise covered by a jacket and hood; and (7) when he asked the individual to stop, the individual tried to "pedal faster."

¶ 25     These facts, collectively, show that under the totality of the circumstances Brittingham had reason to suspect D.M. had committed a crime and thus had reasonable suspicion to stop him. *See Brown,* ¶ 10.  Brittingham arrived at the home to investigate a burglary in progress and was not on a routine patrol or searching for unreported violations of the law in a high-crime area.  *See Outlaw,* 17 P.3d at 157 ("We have rejected the proposition that a

history of past criminal activity in an area is itself sufficient to create a reasonable suspicion that a crime is being, has been, or will be committed."); *see also Brown*, ¶ 11 (a relevant factor is the officer's "knowledge or suspicion that the person . . . stopped has been involved in some criminality of the type presently under investigation") (citation omitted). And D.M. was the only individual directly outside the home minutes after the burglary was reported. *See Brown*, ¶ 11 (other "nonexhaustive factors to be considered" include the "size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred" and "the number of persons about in that area") (citation omitted). Finally, that Brittingham could not verify other descriptors of D.M. due to D.M.'s hood and jacket is not dispositive. *See id.* at ¶¶ 13-14 (even a total lack of a description of a suspect, other than the reasonable conclusion that the person involved in an alleged domestic disturbance was male, was not dispositive). That D.M. roughly matched the description of the suspect and his presence at the scene of the alleged burglary minutes after its reporting support the existence of reasonable suspicion.

¶ 26    With that reasonable suspicion, when Brittingham stopped D.M. he could ask his name and search him for weapons. *See People v. Archuleta*, 980 P.2d 509, 513 (Colo. 1999) (during "an investigatory stop, an officer may take reasonable measures necessary to ensure his own safety"); *see also Brown*, ¶ 14 (Because the officer had "a specific and articulable basis" to believe the suspect was involved in a crime, "it was reasonable for the officer to stop [the suspect] and ask him his name."); *see also* § 16-3-103(1) & -103(2), C.R.S. 2024 (police may stop suspects with reasonable suspicion and ask for their name and may conduct a pat-down search for weapons for personal safety). The district court did not err, and certainly did not plainly err, by rejecting part of the defense's motion to suppress.

## B.    Discretionary Jury Trial

¶ 27    Next, D.M. argues that the district court erred by denying his request for a jury trial. According to D.M., he was denied due process because he detrimentally relied on the fact that he was statutorily entitled to a jury trial under section 19-2.5-610(1), C.R.S. 2024, and waived his speedy trial rights by requesting a jury

14

trial, before the prosecution moved to dismiss the charge for second degree assault and the court converted the jury trial into a bench trial. D.M. also contends that this violated his right to fundamental fairness.

¶ 28     D.M. further contends that the court abused its discretion by denying the discretionary request for a jury trial because it did not elaborate as to why a bench trial equally protected his rights. Additionally, D.M. contends the court abused its discretion because it did not consider the impact of the prosecution's dismissal of the assault charge so close to trial, arguing this allows prosecutors to charge juveniles with serious offenses before dismissing them, thus delaying cases and giving the prosecution time to prepare while juveniles remain in custody.

¶ 29     The People counter that the court's decision to hold a bench trial was discretionary, the court was not required to explain its decision by referencing specific factors, and prosecutors had not manipulated the system. The People also contend a bench trial provided D.M. with the requisite fundamental fairness. Furthermore, the People argue, the detrimental reliance doctrine

15

does not apply because there was no governmental promise for D.M. to have detrimentally relied upon and D.M. did not suffer a detriment.

¶ 30    Finally, the People argue that the longer wait for a jury trial did not render the proceedings fundamentally unfair or result in a longer period of pre-trial confinement because D.M. was in custody on a separate charge while this case was pending.

### 1.    Additional Background

¶ 31    Because D.M.'s charge for second degree assault with a deadly weapon was a "crime of violence" pursuant to section 18-1.3-406(2)(a)(II)(C), C.R.S. 2024, D.M. was entitled by statute to a jury trial under section 19-2.5-610(1), if he wished.  D.M. therefore requested the matter be transferred to district court for a jury trial. After the transfer, the defense confirmed that it was requesting "a jury trial and we're asking for six jurors" and that it "underst[ood] speedy trial expands beyond the 60 days" pursuant to section 19-2.5-610(4).[4]

---

[4] The parties agreed that the speedy trial deadline would be October 27, 2023.

¶ 32      The jury trial was set for August 2, 2023, but on July 12 the prosecution moved to dismiss the second degree assault and drug charges. The prosecution also moved to vacate the jury trial, arguing that without the assault charge D.M. was no longer statutorily entitled to a jury trial. The prosecution asked the court to exercise its discretion under section 19-2.5-610 to convert the matter into a bench trial.

¶ 33      At a pretrial hearing the next day the defense maintained its request for a jury trial, highlighting that jurors were called and citing D.M.'s due process and equal protection concerns. The court recognized the time it would take to try D.M. in a jury or bench trial "isn't a determinative factor or really even a factor [it] would consider," and recognized that proceeding with a bench or jury trial was in its discretion.

¶ 34      The court did, however, express concern that D.M. had been in custody since his arrest and would have passed his speedy trial deadline had it not been extended after the jury trial request. In response, the prosecution represented that the reason for dismissing the assault charge was because D.M.'s father, the

17

victim, had stopped cooperating.  Defense counsel noted, "I would normally ask the court to reconsider bond.  However, [D.M.] has a hold out of Weld County that he can't post, — so I'd rather him just keep acquiring credit for the next three weeks."

¶ 35     The court granted the prosecution's motion to dismiss the two counts and proceeded with a bench trial after finding that D.M.'s rights would be protected.

### 2.     Standard of Review and Applicable Law

¶ 36     We review a district court's decision to grant or refuse a juvenile a jury trial under section 19-2.5-610 for an abuse of discretion.  *See A.C., IV v. People*, 16 P.3d 240, 243 (Colo. 2001); *see also People in Interest of T.B.*, 2016 COA 151M, ¶ 60, *aff'd*, 2019 CO 53.[5]  "An abuse of discretion occurs when a trial court's ruling is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law."  *People v. Payne*, 2019 COA 167, ¶ 5.

---

[5] *A.C., IV v. People*, 16 P.3d 240 (Colo. 2001), and *People in Interest of T.B.*, 2016 COA 151M, cite to section 19-2-107, C.R.S. 2020, for their analysis on discretionary juvenile jury trials.  But section 19-2-107 was repealed and relocated to section 19-2.5-610, C.R.S. 2024, by S.B. 21-059 in 2021.  Ch. 136, sec. 6, § 19-2.5-610, 2021 Colo. Sess. Laws 607.

¶ 37    The "United States Supreme Court has determined that despite the similarities of juvenile proceedings to civil proceedings, due process requires that courts make certain protections offered to adult criminal defendants available to alleged juvenile offenders." *A.C.*, 16 P.3d at 242.  Colorado has accordingly "adopted a 'case-by-case approach analyzing the nature of rights asserted by juveniles under due process standards, giving appropriate weight to the state's interest in "informality, flexibility, or speed" in juvenile proceedings.'" *Id.* at 242 (quoting *People in Interest of T.M.*, 742 P.2d 905, 908 (Colo. 1987)).

¶ 38    Section 19-2.5-610's allowance for discretionary jury trials is part of this approach, and "enumerated the offenses that a jury . . . [or] court must try. . . .  [It] gives the trial judge discretion to balance the benefits of informal, speedy and rehabilitative proceedings against the severity of the offense, the nature of the consequences and the particular facts of the case." *Id.* at 244.

¶ 39    The U.S. Supreme Court held in *McKeiver v. Pennsylvania*, 403 U.S. 528, 543 (1971), that "the applicable due process standard in juvenile proceedings . . . is fundamental fairness." *See also T.M.*,

19

742 P.2d at 908 (adopting the "fundamental fairness" standard). But juveniles have "no right to a jury trial in . . . delinquency proceeding[s] under the due process clause of the federal constitution" or the Colorado Constitution. *T.M.*, 742 P.2d at 907, 909; *see also A.C.*, 16 P.3d at 244-45. Furthermore, section 19-2.5-610's grant of discretion to the district court to allow or deny jury trials for non-enumerated offenses "is not so fundamentally unfair as to violate the juvenile's due process rights." *A.C.*, 16 P.3d at 244.

### 3.    Application

¶ 40    A bench trial did not violate D.M.'s due process rights or fundamental fairness principles because juveniles are not constitutionally entitled to jury trials — the U.S. and Colorado Supreme Court have already rejected D.M.'s contentions in this respect. *See McKeiver*, 403 U.S. at 543; *T.M.*, 742 P.2d at 907, 909; *see also A.C.*, 16 P.3d at 244-45. And the district court did not abuse its discretion when it converted D.M.'s jury trial into a bench trial.

¶ 41　　D.M. was initially statutorily entitled to a jury trial, § 19-2.5-610(1), but once the charges fell outside the statute's reach it was within the district court's discretion to allow a jury trial or bench trial. *See A.C.*, 16 P.3d at 244. And the court considered (but did not heavily weigh) the prosecution's efficiency arguments and the speedy trial concerns the late dismissal presented.

¶ 42　　Section 19-2.5-610(1) does not, as D.M. contends, require that the court detail its reasoning by referencing specific considerations or factors. *See T.B.*, ¶¶ 58-63 (when the court denied the juvenile's motion for a jury trial "without making any factual findings" the court did not abuse its discretion as "it did not deprive him of any rights"). And a discretionary bench trial does not deprive juveniles of their rights. *See id.* Thus, the decision to convert D.M.'s jury trial into a bench trial was "within a range of reasonable options" and was not an abuse of discretion. *See id.* at ¶ 61.

¶ 43　　We also reject D.M.'s contentions that the district court's decision violated D.M.'s due process rights or fundamental fairness because of his detrimental reliance on his statutory right to a jury trial. "The basis for enforcing promises the prosecution makes to a

21

defendant is found in the due process clause of the fourteenth amendment and its requirement that an accused 'be treated with "fairness" throughout the [criminal] process.'" *People v. Macrander*, 756 P.2d 356, 359 (Colo. 1988) (citation omitted) (alteration in original). The first factor to consider "in ascertaining the existence and extent of a defendant's right to enforcement of a governmental promise [is]: whether a promise was made to the defendant by a governmental official with apparent authority to bind the government." *People v. Romero*, 745 P.2d 1003, 1010 (Colo. 1987).

¶ 44     Here the government made no promises to D.M. in exchange for D.M. waiving his speedy trial rights. D.M.'s request for a jury trial was a strategic decision made without promises from the prosecution and with the knowledge that it would extend the speedy trial deadline. And when the assault charge was dismissed, it was the court's decision whether to proceed with a jury trial or not. While the prosecution requested a bench trial, it had no control over the outcome. There was simply no "promise" that D.M. could have detrimentally relied on for the doctrine to apply.

¶ 45    Finally, while we share the district court's concern about D.M. remaining in custody longer, there is no evidence that this was the result of bad faith or manipulation by the prosecution. *See People v. McMurtry*, 101 P.3d 1098, 1101 (Colo. App. 2003), *aff'd on other grounds*, 122 P.3d 237 (Colo. 2005). The prosecution wanted to pursue the assault charge but D.M.'s father's non-cooperation prevented it from doing so. It was ultimately the district court's decision to proceed with a bench trial.

¶ 46    The district court did not abuse its discretion.

### C.    Expired Financial Devices

¶ 47    Finally, D.M. argues that the district court erred when it convicted him of a class 5 felony for possession of four or more "financial devices" (stolen credit and debit cards) under section 18-5-903(2)(c), C.R.S. 2023,[6] when several of the cards were expired, because expired cards cannot meet the definition of a financial

---

[6] In October 2023 the Colorado legislature amended section 18-5-903(2)(c), C.R.S. 2023, with H.B. 23-1293, to make the possession of "three or more financial devices, of which at least two are issued to different account holders, . . . a class 5 felony." Ch. 298, sec. 23, § 18-5-903(2)(c), 2023 Colo. Sess. Laws 1787. In this opinion we cite to the version of section 18-5-903(2)(c) in effect at the time of D.M.'s arrest and trial.

device under section 18-5-901(6), C.R.S. 2024. Further, D.M. argues that the court erred when it found that an expiration date on one of the cards showed the year "25" because the date is illegible.

¶ 48 The People counter that the court's factual findings concerning the date on the card are reviewed for clear error, and D.M. has failed to show clear error. The People also contend that, under the applicable statutes, credit and debit cards meet the definition of a financial device whether active or expired. Thus, the court's factual and legal findings were not erroneous.

### 1. Additional Background

¶ 49 After the prosecution's case in chief, the defense moved for a judgment of acquittal. The defense argued, in part, that the prosecution had not met its burden to show that D.M. unlawfully possessed four or more financial devices because only three of the credit and debit cards listed expiration dates after the time of D.M.'s arrest, and expired cards cannot meet the definition of a financial device in section 18-5-901(6). The defense asked for the charge to be dismissed or at least reduced to a misdemeanor.

¶ 50 A financial device is "any instrument or device that can be used to obtain cash, credit, property, services, or any other thing of value or to make financial payments, including but not limited to" credit and debit cards. §§ 18-5-901(6), -901(6)(a). And section 18-5-903(1) makes it unlawful to possess financial devices "that the person knows, or reasonably should know, to be lost, stolen, or delivered under mistake." The unlawful possession of one or more financial devices is a class 2 misdemeanor, § 18-5-903(2)(a), and in 2023 the criminal possession of "four or more financial devices, of which at least two are issued to different account holders," was a class 5 felony, § 18-5-903(2)(c).

¶ 51 The court found that the above statutes do not explicitly clarify whether an expired credit or debit card is a financial device that "can be used to obtain cash, credit, property, services, or any other thing of value or to make financial payments." § 18-5-901(6). But sections 18-5-702(1) & -702(1)(a), C.R.S. 2024, criminalize the "unauthorized use of a financial transaction device if [a person] uses such device for the purpose of obtaining cash, credit, property, or services or for making financial payment, with intent to defraud"

25

with notice that the "device has expired, has been revoked, or has been canceled."[7] As a result, the court concluded that expired credit and debit cards could be financial devices because a contrary interpretation would mean that the possession of an expired financial device could never be a crime but it would be a crime to try to use an expired financial transaction device, noting that the "two concepts are at odds with one another."

¶ 52    The court also found that there were a sufficient number of unexpired credit and debit cards to make the question moot. Of the nine cards police found on D.M. that could have been financial devices shown in the prosecution's Exhibit 3 (a color photo of the cards laid out on a table), three were clearly valid credit or debit cards that expired after D.M.'s arrest. Five cards, however, either had no dates or were too difficult to read in the photo to know for sure. The card that tipped the balance was a "Netspend" card, which the court — viewing a color photograph marked Exhibit 3 —

---

[7] The definition of a "financial transaction device" in part 7 differs from a "financial device" in part 9, but does specify that it includes credit and debit cards that "can be used to obtain cash, goods, property, or services." § 18-5-701(3), C.R.S. 2024.

26

found had a legible expiration year of "25" despite being admittedly "hard to see." Thus, the court found four cards sufficient to support an adjudication for count 2.

### 2. Standard of Review and Applicable Law

¶ 53 We review a district "court's legal conclusions de novo and its findings of fact for clear error[.] Under the clear error standard, a trial court's 'factual findings are "binding unless so clearly erroneous as not to find support in the record."'" *People v. Turner*, 2022 CO 50, ¶ 19 (citations omitted).

### 3. Application

¶ 54 We need not decide whether an expired credit or debit card can qualify as a financial device because the district court's factual findings concerning the Netspend card were not clearly erroneous.

¶ 55 When reviewing photographic or video evidence we are sometimes "in the same position as the district court to review the details of the photographs" or videos and may therefore review them and their legal implications de novo. *People v. Shanks*, 2019 COA 160, ¶ 50; *see also People v. Liebler*, 2022 COA 21, ¶ 21 ("Where there is a video recording of the relevant events . . . , we are in the same position as the jury . . . ."). But we must also consider

27

whether differing interpretations of a photograph or video are reasonable depending on factors such as the "quality, the lighting and angle, and whether [they are] a complete depiction of the events at issue." *Liebler*, ¶ 22 (citing *Love v. State*, 73 N.E.3d 693, 699-700 (Ind. 2017)) (directing that "[i]n cases where the video evidence is somehow not clear or complete or is subject to different interpretations, we defer to the trial court's interpretation").

¶ 56    Three of the nine credit and debit cards were clearly not expired, a finding supported by Exhibit 3.  But our scanned copy of Exhibit 3 is admittedly blurry in places and the Netspend card's expiration date is difficult to make out.  Yet the district court, with the benefit of a physical photo, did not express much doubt that the expiration date read "25," noting that "even though it's hard to see, the bottom righthand Netspend card I believe has an expiration date of '25."

¶ 57    We cannot say that the district court's finding was unreasonable or clearly erroneous.  Under the circumstances we may not "substitute our own judgment for that of the trial court."

28

*People v. Pitts*, 13 P.3d 1218, 1221 (Colo. 2000); *see also Liebler*, ¶ 22; *Love*, 73 N.E.3d at 699-700.

¶ 58  Because the district court found that the Netspend card's expiration year was "25," there were four non-expired cards necessary to support a felony adjudication under section 18-5-903(2)(c), making the expired cards issue moot. *See Galvan v. People*, 2020 CO 82, ¶ 49 (we may not issue advisory opinions on hypothetical fact situations). The district court did not err.

III.   Disposition

¶ 59  We affirm the district court's adjudication.

JUDGE GOMEZ and JUDGE LUM concur.